## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

LYNN KIRSCHBAUM, JARED KRUGER, and
DONNA and ROBERT KOON on behalf of
themselves and all others similarly situated,

v.

LELY NORTH AMERICA, INC., LELY
INDUSTRIES N.V., LELY INTERNATIONAL
N.V., and LELY HOLDING B.V.

Case No.

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Lynn Kirschbaum, Jared Kruger, and Donna and Robert Koon ("Plaintiffs") bring this action individually and on behalf of all others similarly situated against Lely North America, Inc., Lely Industries N.V., Lely International N.V., and Lely Holding B.V. (collectively, "Lely" or "Defendants") and state as follows:

## NATURE OF THE ACTION

1.      Lely, an "international" business in the agricultural sector with its origins in The Netherlands, purportedly seeks to "provide advice on how to organize a dairy farm smartly with the use of management systems" with the self-proclaimed mission to "create innovative solutions that help [its] customers excel in sustainable milk production to feed the world." Lely boasted that it "[o]riginat[ed] from a farm" to induce dairy farmers to trust in and rely on its uniform promise to provide them with "[a] sustainable, profitable and enjoyable future in farming."

2.      Lely systematically misuses the trust endowed to it by dairy farmers by virtue of the company "[o]riginating from a farm" to benefit its bottom-line at the expense of dairy farmers in the United States and across the world to whom it uniformly represented that the only way for them to grow their businesses, remain viable and combat ever-increasing labor costs is to "switch

towards automated milking," which it uniformly claimed is "the best way to achieve optimal results with [] available labour while maintaining maximum respect for [] cows."

3.      The "automated milking" solution proposed by Lely is the Lely Astronaut A4 – an automatic milking system purportedly designed to optimize quality milk yield in a cow-friendly, hygienic and efficient way – which was designed, manufactured, marketed, sold, distributed and installed by Lely.

4.      The Lely Astronaut A4 consists of a complete feeding, milking, cooling and cleaning system, which draws cows to the system for milking by offering feed.  As uniformly marketed and represented by Lely, once the cow enters the Lely Astronaut A4, "the 3D camera determines the approximate position of the cow's udder," then "the robot arm is positioned so the cleaning brushes can clean and massage the teats" in a process known as pre-stimulation, after which "the robot arm is positioned to attach the teat cups to the teats."

5.      Drawing on its past performance and historical data from its T4C management system (the "T4C Data"),[1] Lely uniformly promised to dairy farmers that the cleaning and pre-stimulation performed by the Lely Astronaut A4 provides "40% more effective cleaning and stimulation as compared to conventional situations" when, in actuality, it only brushed all four teats of each cow a mere sixty-seven percent (67%) of the time and, even then, failed to remove a staggering ten to twenty percent (10-20%) of the bacteria present, or adequately dry each teat.

6.      Lely also uniformly marketed and promised that "[a]fter attachment of the teat cups, the Lely robot . . . ensures that . . . milk is taken from each quarter[,]" all the while concealing its unique, peculiar and superior knowledge that there is a two to five percent (2-5%) teat cup

---

[1]      The T4C management system collects "real-time" data and information detailing the abilities, benefits, capabilities, defects, failures, functions, past performance and problems with the Lely Astronaut A4, which is analyzed and reviewed by the Research and Development Department of Lely.

attachment failure rate.  When a teat cup attachment failure occurs, one or more teats of the cow are either not fully milked or, as frequently is the case, not milked at all.  This failure is commonly referred to as "missed quarters," which, among other things, results in cows becoming ill and developing mastitis, an inflammation and infection in the udder.

7.     Again drawing on past performance and the T4C Data, Lely uniformly promised that the Lely Astronaut A4 also: (a) provides "production increases of 10 to 15%" with labor productivity increases "to 1.2 million kg of milk per year per employee[;]" (b) "milk[s] 60 cows per robot or more, with an average of 2.6 milkings per cow per day[;]" (c) "achieve[s] 180 milkings per day[;]" (d) "harvest[s] 5,000 pounds (2,268 kg) of milk per day[;]" (e) "offer[s] the lowest costs of ownership," "[t]he lowest service costs," and a "reduction of feed costs[;]" and (f) has "an extra 10-15%" of "robot capacity," resulting in "more milk in the tank."

8.     Lely also uniformly promised that the Lely Astronaut A4 is equipped with a "Milk Quality Control" feature referred to as the "MQC," which, according to Lely, continuously "examines the quantity and quality of the milk received from the cows" by measuring its electrical conductivity ("EC") and color "and, if necessary, [] separates milk that is contaminated or is not to the correct standard."  EC and color are inadequate and unsatisfactory methods for detection of clinical mastitis, abnormal milk or subclinical mastitis and, when relied on to separate abnormal milk, fail to separate thirty percent or more (30%+) of the abnormal milk produced.

9.     In reliance on these and other representations made to them by Lely, Plaintiffs and many other dairy farmers purchased Lely Astronaut A4 robots at costs exceeding hundreds of thousands of dollars and, at the behest of Lely, expended additional costs to design, modify, retrofit and/or build new barns to install the system, which did not perform as advertised, marketed or represented, were plagued by numerous, incurable and latent defects that Lely concealed and,

contrary to the uniform representations of Lely, caused economic harm to purchasers and physical harm to their property, including to their cows and milk product.

10.     After inducing dairy farmers to purchase Lely Astronaut A4 robots, Lely delivered a product that was defectively designed, was not free from defects in material and workmanship, failed to conform to the express and implied warranties of Lely, and failed to perform as uniformly advertised, marketed and represented by Lely.  Among other defects, the Lely Astronaut A4 was plagued with the following defects and operational problems:

a.   <u>Pre-Stimulation</u>: the pre-stimulation performed by the Lely Astronaut A4 is defective and fails to operate properly in that all four (4) teats of a cow are not brushed approximately thirty-three percent (33%) of the time and, even when brushed, only eighty to ninety percent (80-90%) of the bacteria present on the teats and udder is removed, a defect which is compounded by the failure of the robot to adequately and properly dry each teat before the start of the milking process, or discriminate between a dirty and clean udder.

b.   <u>Teat Cup Attachment</u>: Lely Astronaut A4 robots routinely experience teat cup attachment failures with a teat cup attachment failure rate of two to five percent (2-5%), due to camera, design, encoder, programming and other defects, causing about twenty-five (25) minutes of unproductive occupation of the robot a day, reducing the capacity of each robot by at least two percent (2%) and, after an unsuccessful milking attempt, reducing milk yield of the quarter that was not milked by twenty-six percent (26%).

c.   <u>Vacuum Capacity/Reserve</u>: the Lely Astronaut A4 has inadequate vacuum capacity and reserve – a defect exacerbated by the friction caused by the corrugated vacuum supply tube, the need to operate the milk pump bladder, and the unnecessary expenditure of energy needed to lift milk from the robot arm vertically upwards into the milk measurement system – and multiple vacuum regulators that oscillate against each other, causing vacuum instability and fluctuations, resulting in, among other issues, liner slips, which cause bacteria-contaminated milk droplets, slugs of milk, and other contaminants (e.g., soil, manure, and dust) to impact against the teat end at speeds of 20 m/s, penetrate the teat canal and enter the teat, all of which adversely affects cow health.

d.   <u>Liners</u>: the liners prematurely and without warning develop cracks, openings, penetrations and tears, and are too large to fit the average teat size of the herds in the United States, resulting in uneven pressure distribution over the surface of the teats with pressure concentrated at the top of the teat where the mouthpiece is located, causing the top of the teat to have prolonged exposure

to vacuum, which, among other things, impedes blood flow with blood pooling at the end of the teats, blood engorgement, and severe callosity.

e.   <u>Milk Quality Control</u>: the mastitis detection methods and milk quality control measures of the Lely Astronaut A4, which evaluate the milk being produced by measuring its EC and color, are defective, inadequate and unsatisfactory in that the sensitives and specificities of these evaluation methods for automatic diversion of milk are too low, the use of EC and milk color as detection methods are inadequate for detection of clinical mastitis, abnormal milk, or subclinical mastitis, and thirty percent or more (30%+) of the abnormal milk produced is not automatically diverted away from the milk tank.

f.   <u>Milk Flow/Removal</u>: the Lely Astronaut A4 is programmed to, or otherwise does, overmilk teats, as the end of milking and time delay for removal of the teat cups from each teat is such that udders are milked too dry, resulting in trauma and hyperkeratosis at the teat end.

g.   <u>Post-Stimulation</u>: the Lely Astronaut A4 fails to accurately spray and cover teats with disinfectant of the proper viscosity during post-stimulation due to camera, encoder, programming and other defects, which prevent the robots from accurately determining teat location, and fails to account for the decreased diameter of teats after they have been milked.

h.   <u>Milk Pump Bladder</u>: the silicone milk pump bladder of the Lely Astronaut A4, which transports milk to the milk tank, is made of defective materials insufficient to withstand their intended, foreseeable and normal use, which cause the milk pump bladder to routinely fail sooner than the life-span of forty-thousand (40,000) milkings uniformly represented by Lely in the Lely A4 Astronaut Owners Maintenance schedule.

i.   <u>Radio Frequency Filter</u>: the radio frequency filter of the Lely Astronaut A4, which is responsible for preventing the occurrence of stray voltage, routinely fails resulting in stray voltage issues due to, among defects with the radio frequency filter, the fact that it is never scheduled to be checked or tested and is never scheduled for maintenance, all of which is beyond the capability of a dairy farmer, as it requires specialized equipment.

11.   As a result of these defects and others specified herein, the Lely Astronaut A4 failed to, among other things: provide production increases of ten to fifteen percent (10-15%) with labor productivity increases; milk sixty (60) cows per robot an average of 2.6 times a day; achieve one-hundred eighty (180) milkings a day; harvest five-thousand (5,000) pounds of milk a day; reduce feed and labor costs; provide lower costs of ownership and service than conventional milking

systems; have an extra robot capacity of ten to fifteen percent (10-15%); disinfect the whole system after milking each cow; and eliminate bacteria or prevent cross-contamination.

12.     Moreover, as a result of the foregoing, the Lely Astronaut A4 also: failed to remove ten to twenty percent (10-20%) of the bacteria present on the teats and udder before attaching the teat cups, allowing that bacteria to contaminate the end milk product, increase cross-contamination rates, and impact against teat ends, increasing udder health problems; and caused vacuum instability and fluctuations, resulting in bacteria-contaminated milk droplets, slugs of milk, and other contaminants to impact against teat ends, penetrate the teat canal and enter the teat, which caused physical damage to, and increased the infection rate of, herds over the long term.

13.     The maintenance and feed costs required to operate the Lely Astronaut A4 were also much higher than uniformly represented by Lely.  Despite uniformly representing that each Lely Astronaut A4 robot "only requires a maximum of four maintenance calls per year" with annual maintenance costs of no more than four-thousand dollars ($4,000) and reduces feed costs, each robot required more than four maintenance calls a year with annual maintenance costs of approximately ten to fifteen thousand dollars a year ($10-15,000) per robot, and the cost of feed increased due to the need to use only pelleted feed, a fact that Lely uniformly concealed.

14.     Lely knew, or should have known, of these defects and the problems with the Lely Astronaut A4 before even a single robot was sold.  Since Lely designed, patented and manufactured the Lely Astronaut A4, it was aware of the defects and problems with the Lely Astronaut A4 by virtue of having created them.  Lely also knew from testing the Lely Astronaut A4, or would have known had adequate and proper testing of the Lely Astronaut A4 been performed for a sufficient period of time, that the Lely Astronaut A4 was defectively designed, not free from defects in material and workmanship, and did not function or operate as represented.

15.     Moreover, Lely also knew or should have known there would be defects and problems with the Lely Astronaut A4 no later than 2007 (and likely earlier), when the Journal of Dairy Science published an article, which, among other things, noted that the software and technology ultimately incorporated into the Lely Astronaut A4 suffered from a devasting teat cup attachment failure rate of two to five percent (2-5%), which it cautioned "present[s] an overly optimistic picture, in that more milkings would fail . . . in a broader range of cows." *See* Exhibit A, p. 4271-72.  That is, Lely knowingly incorporated defective technology into the Lely Astronaut A4.

16.     The same is true of the MQC, which was the subject of a study published by the Acta Argiculturae Scandinavica Journal before a single Lely Astronaut A4 robot was sold.  That study and others discussed therein concluded that the detection methods of the MQC are inadequate, finding that abnormal "milk was not diverted automatically on the day on which the farmer diagnosed clinical mastitis," with thirty percent or more (30%+) of the abnormal milk produced not being automatically diverted in direct contradiction to the uniform representation of Lely that abnormal milk is "easily traced and, if required, automatically separated."

17.     Further, no later than 2017, Lely was informed at its United States headquarters in Pella, Iowa, that the Lely Astronaut A4 has inadequate vacuum capacity and reserve, and fails every recognized test used to assess vacuum capacity and reserve – a defect of which Lely was already well-aware, yet failed to correct or cure and, instead, intentionally concealed from prospective purchasers, because increasing vacuum capacity and reserve would increase electrical costs, thereby preventing Lely from pushing its key selling point that the Lely Astronaut A4 "offer[s] the lowest cost of ownership" and:

has a much lower electric, water and natural gas usage rate, resulting in a lower annual energy cost compared to the milking parlor system.

18.     Once Lely induced the sale of a Lely Astronaut A4 robot, it systematically breached its contractual promises and failed to honor its express and implied warranties, failed to correct or repair the defects and problems with the Lely Astronaut A4, did not offer to refund the purchase price paid by purchasers for the system, not to mention the vast sums of money purchasers spent to design, modify, retrofit and/or build new barns to install the system, and actively concealed the defects and problems with the Lely Astronaut A4 by blaming purchasers for its failures, despite its unique, peculiar and superior knowledge to the contrary.

19.     Lely had unique, peculiar and superior knowledge of the defects and problems with the Lely Astronaut A4 from, among other non-public sources, the T4C Data, product testing, its own internal data and studies, expert consultations, scientific journal articles that were not accessible to or obtainable by Plaintiffs or other dairy farmers upon reasonable diligence, and the experiences relayed to it by other dairy farmers, all of which Lely concealed from Plaintiffs and the other dairy farmers to whom the Lely Astronaut A4 was sold pursuant to its deceptive marketing scheme.

20.     The defects and problems with the Lely Astronaut A4 were latent in nature, not disclosed by Lely to purchasers of the Lely Astronaut A4, not readily apparent, obvious or visible to purchasers before the Lely Astronaut A4 was operational and incorporated into a barn that was either newly built or retrofitted to accommodate its use, and could not have been discovered by purchasers upon reasonable diligence and inspection.

21.     The defects and problems with the Lely Astronaut A4 were not caused or contributed to by variation in farm animals, management practices or other conditions beyond the

control of Lely or in the control of the farmers who purchased Lely Astronaut A4 robots and, instead, were caused by the defects with the Lely Astronaut A4 that Lely created, over which it had control and of which it had peculiar, unique and superior knowledge.

22.     The defects and problems with the Lely Astronaut A4 could not be corrected through a repair or replacement of the Lely Astronaut A4 and, despite the foregoing, Lely provided no refund or any other minimum adequate remedy sufficient to compensate them for their actual damages caused by the Lely Astronaut A4.

23.     As a result of the foregoing and the other misconduct alleged herein in which Lely engaged, numerous dairy farmers have been seriously injured, many of whom are on the brink of financial ruin.  Consequently, these farmers look to their legal remedies in the hopes of obtaining the compensation they are rightfully and legally entitled to recover for the property damage and pecuniary losses they suffered as a result of the acts and omissions of Lely.

24.     Among other uniform harms suffered by Plaintiffs and other purchasers of Lely Astronaut A4 robots, each purchaser of a Lely Astronaut A4 robot was automatically subjected to a uniform, single source of harm, specifically the effect that the misconduct of Lely in advertising and marketing the Lely Astronaut A4 had on its purchase price, which caused it to be inflated far beyond its value due to the fact that the purchase price inappropriately reflected the false information uniformly represented by Lely to dairy farmers in the United States.

25.     Every purchaser of a Lely Astronaut A4 robot was necessarily injured by Lely's conduct – including the concealment of known defects Lely had a legal duty to disclose – which caused the purchase price of each robot to be artificially and fraudulently inflated far beyond its actual value, meaning every purchaser was injured by paying too much when, had the truth been known, they would have paid a lower price or not purchased at all.

26.     Those dairy farmers that continue to milk their cows with Lely Astronaut A4 robots are completely dependent on Lely to provide parts and service just to keep the robots functioning, even though they do not function as uniformly advertised, marketed and represented by Lely. This dependence is heightened by the fact that dairy cows must be timely milked each day or else they will develop mastitis and other serious health issues or death.

27.     Another reason that these farmers are so dependent on Lely is that their barns were designed and either newly constructed or retrofitted at the behest of Lely to accommodate the Lely Astronaut A4 and cannot be used to milk cows by any alternative method; that is, Lely knowingly created a situation where dairy farmers are incapable of milking their cows through any system other than its Lely Astronaut A4.

28.     Lely created and manufactured this system of dependency to further its deceptive, fraudulent and negligent uniform marketing scheme, knowing that it would deter dairy farmers to whom Lely Astronaut A4 robots were sold from seeking legal recourse out of fear of retaliation by Lely.  As a result, the only recourse for farmers still using Lely Astronaut A4 robots is to join a class action.

## JURISDICTION AND VENUE

29.     Jurisdiction and venue are proper in this Court.

30.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Lely and class members are domiciled in different states.

31.     This Court has personal jurisdiction over Defendants. Lely North America, Inc. maintains Lely Centers in Minnesota, one of which is located in Plainview, Minnesota and is the

center from which Plaintiff Jared Kruger purchased his Lely Astronaut A4. Defendants directed their actions to the State of Minnesota by selling, marketing, and advertising the Lely Astronaut A4 robots, and therefore have sufficient minimum contacts to render the exercise of jurisdiction by this Court proper and necessary. Lely maintains its principal place of business at 775 250th Avenue, Pella, Iowa 50219.

32.     Further, as alleged in detail herein, this Court has personal jurisdiction over Lely Industries N.V., Lely International N.V. and Lely Holding B.V., because Lely North America, Inc. is a mere division of those entities, which control and dominate the affairs of Lely North America, Inc., including its affairs in Pella, Iowa, such that Lely Industries N.V., Lely International N.V. and Lely Holding B.V. are the legal "alter egos" of Lely North America, Inc., all of which directed their actions to the State of Minnesota by selling, marketing, and advertising the Lely Astronaut A4 robots through Lely North America, Inc. using misleading, inaccurate, negligent and false representations.

33.     Venue is proper pursuant in this District under 28 U.S.C. § 1391(b) because a substantial part of the conduct at issue in this case occurred in this District.

## PARTIES

*Plaintiffs*

34.     Plaintiff Lynn Kirschbaum ("Kirschbaum") is a dairy farmer, who resides in and operates a family-run dairy farm in Glen Haven, Wisconsin (the "Kirschbaum Farm"). Kirschbaum purchased two A4 robots that went into operation on or about September 29, 2016.

35.     Plaintiff Jared Kruger ("Kruger") is a dairy farmer, who resides in and operates a family-run dairy farm in Wabasha, Minnesota (the "Kruger Farm"). Kruger purchased one A4 robot that went into operation on or about November 13, 2015 from Dairyland Equipment

Services, now known as Leedstone, Inc., a Lely Center located at 24650 County Road 27, Plainview, MN 55964.

36.     Plaintiffs Donna and Robert Koon (the "Koons") are dairy farmers, who reside in and operate a family-run dairy farm in Berryville, Virginia (the "Koon Farm"). The Koons purchased two A4 robots that went into operation on or about April 25, 2018.

***Defendants***

37.     Lely Holding B.V. ("Lely Holding") is a company founded under the laws of The Netherlands with its principal place of business located in Maassluis, Netherlands. On information and belief, Lely Holding is the parent company of Lely Industries N.V. ("Lely Industries"), a company founded under the laws of The Netherlands with its principal place of business located in Maassluis, Netherlands. On information and belief, Lely Industries is the parent company of Lely International N.V. ("Lely International"), a company also founded under the laws of The Netherlands with its principal place of business located in Maassluis, Netherlands.

38.     Lely North America, Inc. ("Lely NA") is a Delaware corporation with its principal place of business at 775 250th Avenue, Pella, Iowa 50219, which advertises, designs, develops, distributes, installs, maintains, manufactures, promotes, repairs, sells, and services equipment and systems for milk production in the agricultural sector, including, but not limited to, the Lely Astronaut A4. Lely maintains two "Lely Centers" in Minnesota, one in Plainview, MN and one in Melrose, MN.[2] On information and belief, Lely NA is a wholly owned subsidiary of Lely Industries.

39.     Defendants (collectively, "Lely") hold themselves out as a single enterprise and a single entity despite the technical existence of separate corporate structures. First, Lely

---

[2]     *See* Lely Center Locator, available at https://www.lely.com/locator/us (last visited Feb. 27, 2020).

International and Lely NA are mere divisions of Lely Industries, which, in turn, is a mere division of Lely Holding, despite the existence of technically separate corporate structures. Second, there is a close, synergistic relationship between the Defendants.

40.     Lely maintains a single website on which it promotes "Lely" and the "Lely Group" without regard to any corporate form. The Lely website (www.lely.com) describes Lely as "[a]n international family business in the agricultural sector." A December 26, 2018 article in The Pella Chronicle, titled "Lely growth plan gets state, city support," stated that "Lely Industries has 1,300 employees in 40 nations around the world."

41.     Up until January 1, 2020, the CEO of Lely was Alexander van der Lely, after which time he became the chairman of the "newly formed Supervisory Board for Lely." The purpose of the Supervisory Board is to "ensure that Lely remains a healthy family business." In an interview entitled "Feed the Future by Lely," posted on the Lely YouTube channel on or about September 3, 2019, Mr. Lely describes Lely as a family business which "from 70 years ago till now, [is] distributing [] products in over 40 countries worldwide . . . mainly in the western countries of the world where labour is an issue."

42.     Mr. Lely gave an interview with Progressive Dairy, a publication based in the United States, which was posted on the Progressive Dairy YouTube channel on or about April 27, 2012. In that interview, Mr. Lely commented that he saw "big potential in the U.S." for Lely automatic milking systems. Mr. Lely also explained that Lely has "a lot of sensors" in the equipment, which "get a lot of information into a management system" known as the Lely T4C management system. That information is then, according to Mr. Lely, reviewed by Lely's Research and Development Department in The Netherlands which "analyzes all the figures . . ."

43.     In the same April 27, 2012 interview, Mr. Lely explained the corporate structure of the so-called "Lely Group" – in response to the following prompt: "With all these different locations internationally how do you plan to divide your time between facilities?" – stating, in pertinent part, as follows:

> In the group, we are organized in an executive board of five people. One of the board members is focusing on the operations and looks after the different factories and IT systems. I personally take care of the engineering, R&D, and the marketing aspect . . . so we split ourselves five board members each having responsibility.

44.     The Lely website boasts a single "Board of Management" for the "Lely Group" without regard to corporate form. The Board of Management touts itself as having "worldwide" responsibilities for "Lely," generally promoting the purpose of the Board of Management with the all-encompassing statement that "[f]armers all over the world make choices about how they set up and run their farms . . . [e]very day, we help them make the best choices for themselves and their farms . . ."

45.     There is a commonality of management between and among Defendants. The most recent Biennial Report of Lely NA, filed on or about March 28, 2018, states that Lely NA has five (5) officers/directors: (1) Gijs Scholman (Director); (2) Jerry Bacon (Secretary/Treasurer); (3) Martijn Boelens (Director); (4) Peter Langebeeke (President); and (5) Ronald Eikelenboom (Director). A September 6, 2017 letter from Lely NA to the Iowa Secretary of State also listed Chad Huyser as the Vice President of Lely NA. Each of the foregoing officers/directors are listed with an address at 775 250th Avenue, Pella, Iowa 50219,

46.     Gijs Scholman, a Director of Lely NA, is also listed as a member of the Lely Board of Management as "Vice President Sales." Mr. Scholman describes his role as "being responsible for [Lely's] distribution channel and the availability of Lely Solutions, Service and Support

worldwide" with a focus on "deliver[ing] an unmatched experience to farmers globally." Mr. Scholman listed his address in Pella, Iowa, with the Iowa Secretary of State and his LinkedIn page indicates he is based out of Maassluis, The Netherlands, serving as the "Chief Commercial Officer" of "Lely Holding."

47.     Martijn Boelens, a Director of Lely NA, is also listed as a member of the Lely Board of Management as "Vice President Customer Solutions." Mr. Boelens describes his role with "Lely" as one "[t]o make farmers lives around the world bright." Mr. Boelens listed his address in Pella, Iowa, with the Iowa Secretary of State and his LinkedIn page indicates he is based on of Maassluis, The Netherlands, serving as the "VP Customer Solutions" for "Lely," without regard to any corporate form.

48.     Peter Langebeeke is listed as President of Lely NA in the last publicly available filing with the Iowa Secretary of State on March 28, 2018, with an address in Pella, Iowa. Mr. Langebeeke's LinkedIn page has him listed as serving dual roles – President of Lely NA and "Regional Director America's" for Lely International. Prior to his current positions, Mr. Langebeeke served as Vice President Sales & Marketing for Lely Industries.

49.     Ronald Eikelenboom, a Director of Lely NA, is also listed as a member of the Lely Board of Management as Chief Financial Officer, the self-described "leader of the Finance, IT, Legal & Risk & Compliance teams, [] represent[ing] the compass function to value creation and protection on strategic plans and operational execution which – in the end – will help [Lely] realizing [their] goal." Despite an address in Pella, Iowa, filed with the Iowa Secretary of State, Mr. Eikelenboom's LinkedIn page lists him in the Rotterdam Area, The Netherlands, serving as "Member of the Board / CFO of Lely Group," without regard to any corporate form, where he "leverages [his] international experience for value creation and business development."

50.     The remainder of the individuals on the Lely Board of Management also confirm that their role is one on behalf of Lely as a worldwide entity, without distinction or specificity as to corporate form.    Andre van Troost, Vice President Customer Care, touts that it is his responsibility "to ensure [Lely] deliver[s] optimum care for [Lely] customers worldwide." Marijke Jansen is the Vice President Human Resources & Organization for "Lely," which she refers to as "an organization" and "[a] great workplace in which everyone feels connected with Lely."

51.     Moreover, a September 4, 2019 Lely Inc. press release states: "Chad Huyser has been named a regional director of Lely International and president of Lely North America . . . Huyser will lead all of Lely's North American efforts and serve as one of five Lely regional directors worldwide."    As the Regional Director of Lely International and President of Lely NA, Mr. Huyser describes the Lely organization in a "About Lely North America" section on his LinkedIn page as follows:

> Lely North America, based in Pella, Iowa, is part of the Lely Group, founded in 1948.   Lely directs all effort (sic) toward creating a sustainable, profitable and enjoyable future in farming for its customers.  Using the cow as a center point, the company develops premium robotics and data systems that increase animal welfare, flexibility and production on dairy farms.
>
> For more than 25 years, Lely has been the leader in the sale and service of automated milking systems to successive generations of dairy farmers across the globe.   Every day, Lely inspires its employees to offer customers innovative solutions and be reliable partners for long-term advice and support.  With its head office in The Netherlands and a worldwide network of dedicated Lely Center locations for tailor-made sales and support, the Lely Group is active in more than 40 countries and employs around 1,500 people.

52.     Lely engages in a unified marketing image and corporate branding, including for marketing and branding the Lely Astronaut A4, regardless of corporate form.   Its corporate

insignias, trademarks and logos appear uniform regardless of corporate form, as shown by its website and marketing materials.

53.     Lely has an integrated sales and distribution system across the nominally distinct corporate entities.  For instance, there is substantial overlap of personnel, without any regard or reference to corporate entities or distinction, in the primary departments responsible for worldwide marketing and distribution of the Lely Astronaut A4.

54.     Lely NA performs business functions that Lely Industries, Lely International and/or Lely Holding would ordinarily need to perform themselves to market and sell their products in the United States but for the existence of Lely NA.

55.     On information and belief, Lely NA is the exclusive agent for marketing and sales of the Lely Astronaut A4 in the United States, and while Lely NA may distribute Lely Astronaut A4 robots through third-party dealers, all dealers in the United States must go through Lely NA to get and sell the robots.

56.     On information and belief, employees of Lely NA and employees of authorized dealers of the Lely Astronaut A4 for Lely NA receive training on how to advertise, install, market, service and repair Lely Astronaut A4 robots in The Netherlands from Lely Industries, Lely International, and/or Lely Holding, confirming that, despite the technical existence of separate corporate structures, Defendants are, and hold themselves out as, a single enterprise.

57.     The apparent uniformity of the design, marketing and sale of the Lely Astronaut A4 strongly suggests that Lely Industries, Lely International, and/or Lely Holding exert substantial control over Lely NA in its advertisement, design, installation, marketing, sale, service, and maintenance of Lely Astronaut A4 robots.

58.     For these reasons, Lely NA is a mere division of Lely Industries, Lely International, and Lely Holding.  It is a mere instrumentality or adjunct of the former and part of a single, unified enterprise.  Lely Industries, Lely International, and Lely Holding control and dominate the affairs of Lely NA, including its affairs in Pella, Iowa and at the Lely Centers in Minnesota, such that Lely Industries, Lely International, and Lely Holding are the legal "alter egos" of Lely NA.

59.     At all times hereinafter mentioned, Michael Fitzgerald ("Fitzgerald") was an agent, authorized dealer, employee, employee of an authorized dealer, and/or servant of Lely.

60.     At all times hereinafter mentioned, Leah Lange ("Lange") was an agent, authorized dealer, employee, employee of an authorized dealer, and/or servant of Lely.

61.     At all times hereinafter mentioned, Greg Luebke ("Luebke") was an agent, authorized dealer, employee, employee of an authorized dealer, and/or servant of Lely.

62.     At all times hereinafter mentioned, Alfred Kamps ("Kamps") was an agent, authorized dealer, employee, employee of an authorized dealer, and/or servant of Lely.

63.     At all times hereinafter mentioned, Gary Walton ("Walton") was an agent, authorized dealer, employee, employee of an authorized dealer, and/or servant of Lely.

64.     At all times hereinafter mentioned, the term "Lely" refers to and includes its agents, employees, dealers, sales, representatives, officers, directors and executives.

## FACTUAL BACKGROUND

65.     Lely is an "international" business in the agricultural sector, which purportedly seeks to "provide advice on how to organize a dairy farm smartly with the use of management systems."  The website maintained by Lely boasts that since being founded in 1948, Lely has introduced many "innovations with only one purpose: making agrarian life easier and working together for a sustainable, profitable and enjoyable future in the agricultural sector."  In a likely

attempt to gain credibility in the agricultural sector and gain the trust of dairy farmers across the world, so that it could subsequently defraud them, Lely proclaimed as follows:

> Originating from a farm, we know what it is like to wake up early in the morning. To spend hours in the barn, day in, day out, ensuring optimal treatment of your herd. Feeling the challenge of increasing scale with a view to ensuring a sustainable future. Dairy farming is something we live to do. And we understand how you work, and why.

66.    Lely systematically misuses the trust endowed to it by dairy farmers by virtue of the company "[o]riginating from a farm" to induce dairy farmers to: (a) rely on its promise of providing them with "[a] sustainable, profitable and enjoyable future in farming," and (b) believe in its self-proclaimed mission to "create innovative solutions that help [its] customers excel in sustainable milk production to feed the world." Lely even credits itself as having introduced the most important invention of the 20th century, when it introduced a prototype of the Lely Astronaut in 1992, stating as follows:

> A prototype of the Lely Astronaut milking robot is introduced. Farmers acknowledge this as the most important invention of the 20th century for dairy farmers.

https://www.lely.com/us/about-lely/our-company/history/ (last visited Feb. 27, 2020).

67.    Lely brought the Lely Astronaut to market in 1995 and, in 2005, it introduced the Lely Astronaut A3, which it represented "offers a state-of-the-art design with advanced milking robot technology to ensure greater reliability and flexibility with the Lely Astronaut." The Lely Astronaut A4 was subsequently introduced and, as represented by Lely, the "Astronaut A4 is set up in a modular concept" with "[a] central unit featur[ing] a central vacuum and cleaning system for up to two cow units," as well as a "unique milk quality control (MQC)," which "allows [farmers] to supply only first class milk."

68.     Lely then began pushing the following uniform sales message to dairy farmers in the United States (and across the world) to promote the Lely Astronaut A4, which it knew or should have known was false even before a single robot was sold.

## LELY MARKETING SCHEME

69.     Despite knowledge of the defects and problems with the Lely Astronaut A4 (as discussed in detail herein), Lely continuously and uniformly promised abilities, benefits, capabilities and past performance of the Lely Astronaut A4 with the apparent intent to induce dairy farmers in the United States to expend vast sums of money to purchase and install one or more Lely Astronaut A4 robots, which were each plagued by uniform, incurable defects in design, material and workmanship.

70.     Lely distributed information intended to serve as marketing and sales materials, all the while concealing its peculiar, unique and superior knowledge of the defects and problems with the Lely Astronaut A4, each of which were latent defects of which Plaintiffs and other purchasers could not have been aware prior to them being manifested, were not readily apparent, obvious or visible, and could not have been discovered through the exercise of reasonable diligence.

71.     Such information was published by Lely on its publicly accessible website, as well as in publicly accessible articles, brochures, and catalogs, which were circulated, distributed or otherwise made available to prospective purchasers by Lely to inflate the price point of Lely Astronaut A4 robots and with the intent that such prospective purchasers rely thereon by purchasing robots, and constructing or retrofitting a barn to accommodate their use, leaving them incapable of milking their cows by any other means.

20

## A. The Lely Astronaut A4 Brochure

72.    In a publication titled "Lely Astronaut Robotic milking system" (the "Lely Astronaut A4 Brochure"), signed by Alexander van der Lely, CEO Lely Group, Lely represented that "the new Lely Astronaut A4 milking robot . . . guarantees the highest achievable milk quality while its unique management tools ensure that you have full control over your herd," representing further as follows:

> Better milk quality, higher milk production together with lower costs lead to higher profits.  The Lely Astronaut A4 makes it possible to manage these three aspects to achieve the optimum results.

73.    Lely represented that for farmers to grow their businesses, "this will inevitably require automation" with "[t]he switch towards automated milking [being] a major step" in that direction, stating that it is "convinced that automation is the best way to achieve optimal results with your available labour while maintaining maximum respect for your cows." To facilitate that, Lely represented that it "developed management software dedicated to robotic farming, allowing [farmers] to spend [their] valuable time on the cows that really require attention[.]"

74.    A key, uniform selling point repeatedly emphasized by Lely is that the Lely Astronaut A4 "improves [dairy farmers'] quality of life while safeguarding optimum animal welfare and [their] return on investment." Lely further represented that the Lely Astronaut A4 was actually "designed to improve animal health and well-being[,]" while "offer[ing] [dairy farmers] the most reliable employee [they] can imagine[,]" stating:

> This robot employee is there to milk for you 24/7 for years to come. It is flexible and fully trained to prepare the cow for milking, to attach the teat cups, to reattach in the event that this is required, to detach after milking and to carry out post-treatment.

75.     Lely acknowledges that the success (or, more appropriately, failure) of the Lely Astronaut A4 depends almost entirely on the reliability of the "robot employee," *i.e.* the robot itself, not the dairy farmers it induced to purchase Lely Astronaut A4 robots, because, in this "new style of farm management[,] . . . the decisions are transferred [away] from the farmer[,]" which Lely represented, seemingly based on its historical data, "results in improved cow health, shorter calving intervals and reduction of feed costs, just to mention a few."

76.     Being "aware of the fact that a Lely Astronaut milking robot initially is quite an investment," Lely represented that "[t]hrough the use of first-class materials and by limiting the number of moving parts we guarantee a long lifetime and a significant trade-in value" and, "[b]ased on the first twenty years of Lely Astronaut robots in the field, it can be concluded that in financial terms the robots should be depreciated over a fifteen-year period[,]" during which time farmers can "manage the[ir] herd with no more than ten touches per cow per lactation."

77.     Knowing dairy farmers are desperate to combat ever-increasing operating costs, Lely touted that it "offer[s] the lowest cost of ownership" and, since the Lely Astronaut A4 "only requires a maximum of four maintenance calls per year[,]" it also purportedly offers "[t]he lowest service costs." Lely further represented that the farmers who have already transitioned from a conventional milking system to the Lely Astronaut A4 benefited from "production increases of 10 to 15%" and produced "two million litres [of milk] per year by only one man."

78.     In an effort to secure a foothold in the United States dairy market, Lely represented that the box time of the Lely Astronaut A4 is "reduced by almost 4% per cow visit[,]" as compared to the robotic milking systems of its competitors, which it claimed "has a direct effect on the capacity of the milking robot." To use the example provided by Lely, "[o]n a farm with 120 cows

22

this represents an extra production capacity of 150 kg per day." Lely also represented that the Lely

Astronaut A4 has "an extra 10-15%" of "robot capacity," resulting in "more milk in the tank."

79.     To illustrate its uniform representations that purchasing a Lely Astronaut A4 is a

better financial investment than purchasing any alternative milking system, either conventional or

robotic, Lely made financial projections about the costs of ownership over time for the Lely

Astronaut A4 compared to other milking systems, which were designed to show that even though

a Lely Astronaut A4 "milking robot initially is quite an investment," the "costs in the years to

come" make it the more profitable investment:



80.     Aware of the expense and financial strain caused by an unhealthy herd, Lely

represented that "[t]eat treatment and attachment of the teat cups are done very hygienically to

improve udder health[,]" and that "[e]xtensive data is also gathered, which will help the farmer to

prevent diseases and improve the animal health status of the whole herd." Lely further represented

that its "teat detection system (TDS) features three-level scanning technology which ensures quick

and accurate detection of the teats[,]" which is necessary to avoid missing quarters.

81.     Drawing on the past performance of the Lely Astronaut A4, Lely represented that its "[r]esearch has proved that the unique counter-rotating brushes – together with the precise arm movements – guarantee up to 40% more effective cleaning and stimulation as compared to conventional situations." Lely further represented that the "whole system is thoroughly disinfected after cleaning each cow," as a result of which "bacteria [is] eliminated and cross contamination [is] avoided before each milking."

82.     Lely also boasted the Milk Quality Control ("MQC") feature of the Lely Astronaut A4, which is located inside the robotic arm and, among other things, purportedly measures milk EC and color.  As represented by Lely, the MQC continuously monitors the milk being produced "per quarter" during the milking process, and provides "vital information on mastitis, fat and protein and lactose for managing milk quality and cow health, allowing [the farmer] to respond quickly and achieve optimal milk quality."

**B.  The Lely Dairy Equipment Brochure**

83.     Lely made similar representations in the "Lely Dairy Equipment Milking, feeding and barn solutions" brochure (the "Lely Dairy Equipment Brochure"), wherein it represented that it "create[s] concepts that are a great help to . . . dairy farmer[s]," which "are turned into first-class, reliable and sustainable products, always designed with respect for the farmer, the animals and our environment." Lely acknowledged that the "cow is key" to the success of a robotic milking system, making "an easy assess (sic) entrance and exit for cows" and a comfortable, "quiet and peaceful milking time" of paramount importance.

84.     Drawing on the past performance of the Lely Astronaut A4 and its other robotic milking systems, Lely represented that "since 1992 the Astronaut robotic milking system has provided substantial financial and lifestyle benefits for dairy farmers," which has "never been an

excuse for [Lely] to rest on [its] laurels[,]" representing that "innovation continues" and "has resulted in an impressive range of products[,]" all of which were "developed to assist the farmer in optimizing all essential factors around the milking process."

85.     In an attempt to justify the exorbitant purchase price of the Lely Astronaut A4 and induce dairy farmers to purchase one or more Lely Astronaut A4 robots, Lely represented the trade-in value and operating costs of that system, stating: "Thanks to our focus – throughout product development – on reliability and durability we offer you a range of products with the highest trade-in value, ensuring the lowest energy and water consumption, as well as limited service requirements."

86.     The importance of the foregoing to prospective purchasers cannot be overstated since most of the dairy farmers to whom Lely advertised, marketed and sold Lely Astronaut A4 robots operated family-run farms with very tight profit margins.  In a seeming further attempt to defraud this vulnerable demographic, the members of which consistently "spend hours in the barn, day in, day out" away from their families, Lely represented that the Lely Astronaut A4 provides dairy farmers with the "[f]reedom to enjoy [their] social life," stating further as follows:

> Originally from a farming background, we know what it is like to wake up early in the morning.  To spend hours in the barn, day in, day out, managing your herd in the most optimal way. It is the motivation behind our product development; to ease your workload during the daily routine and to take your dairy operation to new heights of consistency, economy and efficiency, while respecting animal welfare as well as the environment. We understand that better machines, help you to be more productive and we understand that if routine activities are taken over by reliable solutions, you have more time to enjoy a fulfilled life.

87.     Lely represented that "[t]wo decades of robotic milking have made it clear to [its] customers that by allowing the cow to make her own decisions, both comfort and productivity are optimized[,]" because "[t]he cows make their own choice for either resting, being milked or fed,

ensuring maximum performance for all cows across the herd." Drawing on historical data, Lely represented that Lely Astronaut A4 provides "[c]ow production increases of more than 10%" with labor productivity increases "to 1.2 million kg of milk per year per employee."

88.     Lely knows that "[a]nimal wellbeing and an excellent milk quality are [also] keys to successful robotic milking," which is "why Lely started working on measuring milk quality right from the start and . . . [made] this cutting edge technology available to farmers worldwide[,]" allowing them to "measure[] essential parameters such as: fat and protein, conductivity, milk colour, milk time per quarter and dead milk time." As represented by Lely, "[t]he result is healthier cows which leads to lower costs due to maximum productivity and lower veterinary costs."

**C.   The Lely Website**

89.     Lely made numerous representations about the Lely Astronaut A4 on its publicly accessible website, which were intended to serve as marketing and sales materials. It represented that "the Lely Astronaut milking robot" is acknowledged by farmers "as the most important invention of the 20th century for dairy farmers[,]" which offers "[f]lexibility, freedom of choice and well-being for [farmers] and [their] cows while retaining optimal production and high-quality milk," as evidenced by the purported statement of then-existing fact that "[d]airy farmers all over the world have been successful using [Lely] (automated) systems for over twenty years."

90.     Lely represented that a Lely Astronaut A4 robot: (a) "achieve[s] an average of 10% more milk per year than conventional milking systems and 4% more compared to other milking robot manufacturers[;]" (b) "milk[s] 60 cows per robot or more, with an average of 2.6 milkings per cow per day[;]" (c) "achieve[s] 180 milkings per day[;]" and (d) "harvest[s] 5,000 pounds (2,268 kg) of milk per day." Lely also represented that the Lely Astronaut A4 "has a much lower

electric, water and natural gas usage rate, resulting in a lower annual energy cost compared to the milking parlor system."

## LELY KNEW THAT ITS UNIFORM ADVERTISEMENTS, MARKETING AND REPRESENTATIONS WERE FALSE

91.     Lely knew even before it first introduced or sold a single unit of the Lely Astronaut A4 (and, likely, much earlier based on non-public information of which it had peculiar, unique and superior knowledge), that the uniform advertisements, marketing and representations it made to dairy farmers as part of its standard sales practice false or misleading, and that the Lely Astronaut A4 was not free from defects and did not function or operate as uniformly represented.

**A.  The Journal of Dairy Science Article**

92.     The Journal of Dairy Science published an article titled "Comparison of Functional Aspects in Two Automatic Milking Systems and Auto-Tandem Milking Parlors," a copy of which is annexed hereto as Exhibit A (the "Journal of Dairy Science Article"). The two automatic milking systems analyzed were the Lely Astronaut (referred to as "AMS-1") and the DeLaval classic model VMS (referred to as "AMS-2").

93.     The Journal of Dairy Science Article notes that "the most important functional difference between [Automatic Milking Systems] and conventional milking parlors is the automatic teat-cup attachment process, which is controlled in AMS by ultrasonic, laser, or optical sensors."  The Journal of Dairy Science Article then confirmed the abecedarian principle that consistent and reliable teat-cup attachment is crucial for the success of any AMS-equipped farm, stating:

> Consistent and reliable teat-cup attachment is crucial for the success
> of any AMS-equipped farm. Malfunctions of this process may lead
> to milk leakage, because udder stimulation leads to the onset of milk
> ejection. Milk leakage is a risk factor for mastitis because of germ
> proliferation at the teat orifice. Failed milkings should be avoided

on economic grounds, because unsuccessful teat-cup attachment
reduces the capacity of an AMS.

Exhibit A, p. 4265 (internal citations omitted).

94.     The two Automatic Milking Systems ("AMS") analyzed differed in their design in

several ways: "in AMS-1 the arm held the teat-cleaning brushes, the teat-location device, and the

teat cups, whereas only the teat location system was mounted on the service arm of AMS-2. The

teat-cleaning cup and teat cups were obtained in succession from a mounting at the side of the

milking stall in AMS-2." *Id.* at 4266.

95.     The study distilled in the Journal of Dairy Science Article notes that an "average

daily milking frequency of 2.5 was found . . . on farms with AMS-1," *id.* at 4268, which directly

refutes the uniform representation made by Lely, through its agents, servants and/or employees

and on its publicly accessible website, that each Lely Astronaut A4 robot milks at least sixty (60)

cows at least 2.6 times a day each.

96.     The article also noted that the "percentages of successful milkings observed in the

current study were similar to other studies carried out with the same AMS models (AMS-1 95 to

98% . . .)," *id.* at 4271, which means that the Lely Astronaut A4 missed quarters two to five percent

(2-5%) of the time.  This contradicts the uniform representation of Lely that the Lely Astronaut

A4 "ensures" that "milk is taken from each quarter" (i.e., without missing a quarter).

97.     This means that for every one-hundred twenty (120) milkings with a Lely Astronaut

A4 robot, four (4) milkings fail and there are twenty-five (25) minutes of unproductive occupation

of the milking robot, which directly reduces the capacity of each Lely Astronaut A4 robot by at

least two percent (2%).  *Id.*  Capacity is further reduced when cows return to the robot "after

nonmilking visits and failed milkings" with there being a reduction in milk yield.  *Id.*

98.     The Journal of Dairy Science Article cautioned that the results of the study "may present an overly optimistic picture, in that more milkings would fail . . . in a broader range of cows and thus reduce the capacity of the AMS by additional visits to the milking unit shortly after failed milkings." *Id.* at 4271-72.

## B. The 2011 Journal of Dairy Science Article

99.     In or about February of 2011, the Journal of Dairy Science published an article titled, "Invited review: The impact of automatic milking systems on dairy cow management, behavior, health, and welfare," a copy of which is annexed hereto as Exhibit B (the "2011 Journal of Dairy Science Article"). The objective of the article was to analyze the impact of automatic milking systems on cow management, behavior, health and welfare.

100.    The article noted that, as of 2009, only about one percent (1%) of automatic milking systems operational across the world were located in the United States. The article attributed this to "the lack of readily available service providers to assist with mechanical problems," Exhibit B, p. 2228, as well as the ability to find and hire cheap labor relative to other countries, which decreases the appeal of an automatic milking system.

101.    The article noted several disadvantages of automatic milking systems, including that dairy farms on which automatic milking systems are operational are dependent on sensors to detect estrus, abnormal milk, mastitis and other health parameters, thereby taking detection out of the hands of the farm manager and shifting it to a machine, a disadvantage Lely mistakenly touted as a benefit. The article went on to explain that this is a disadvantage because:

> As the focus shifts from traditional management methods and skills to a system reliant on new technology, the opportunity for, and impact of, computer and machine malfunctions increase.

*Id.* at 2229.

102.     In discussing additional disadvantages, the article noted that, "[i]n a survey of fifteen (15) North American dairy producers, all reported difficulties with teat variation and cluster attachment, resulting in 0 to 3 extra culls per year from herds with an average of 94 cows," while in a herd of cows in New Zealand, "8% of potential new cows were rejected due to conformations that were anticipated to result in cleaning and milking difficulties." *Id.* at 2230.

103.     The article noted that "[t]he success rate of AMS cluster attachment in commercial herds ranges from 85 to 98%," meaning that there was a two to fifteen percent (2-15%) teat cup attachment failure rate, resulting in one or more missed quarters. *Id.* The import of the foregoing is that "[f]ollowing teat cup attachment failure, milk production by the quarter that failed to be milked was 26% lower during the subsequent milking . . ." (*id.*):

> Therefore, any anticipated increase in milk production with an
> AMS may not be fully realized . . .

*Id.* at 2235.

104.     With respect to udder health and hygiene, the article noted that there are presently four different devices for teat cleaning used by various automatic milking systems. The four different devices are summarized in the article as follows, with the second device being the one used by the Lely Astronaut A4:

> 1) simultaneous cleaning of all teats by a horizontal rotating brush,
> 2) sequential cleaning by brushes or rollers, 3) simultaneous
> cleaning of all teats in the same teat cups as used for milking, and 4)
> sequential cleaning of individual teats by a separate cleaning device.

*Id.* at 2237.

105.     According to the article, extra care is "needed to clean teats in AMS, as none of the 4 systems dries teats before the start of the milking process, thus eliminating another opportunity to remove bacteria from the teat orifice." *Id.* This missed opportunity is important since there is a

strong "association between udder contamination with manure and the number of mastitis bacteria on teat ends." *Id.*

106.    A study discussed in the article observed that "130 teat-cleaning periods in AMS and found that only 67% of the cleanings were technically successful (i.e., all 4 teats were completely brushed)." *Id.*  The article then noted that "[o]ne of the potential problems with AMS is their inability to discriminate between a dirty and clean udder" and, thus, "programming AMS to stimulate teats based on the anticipated degree of udder fill could make milk removal more effective." *Id.*

107.    Another problem with automatic milking systems is that "the constant visual and auditory stimuli from AMS could stimulate ongoing oxytocin release and milk letdown, which may increase the risk for milk leakage." Milk leakage occurs "significantly more often and in a larger proportion of cows being milked in the AMS," which is problematic because [milk leakage] places a cow at increased risk for mastitis." *Id.* at 2238. The article noted that:

> In general, increases in SCC and decreases in milk quality have been observed in epidemiological studies following the transition to AMS.

*Id.* at 2239.

108.    The article notes that the number one reason dairy farmers invest in an automatic milking system is often frustrated by the need for manual labor to fetch cows, stating: "Dairy farmers have indicated that the number 1 reason for investing in an AMS was the potential savings in labor. However, a reduction in labor is not always possible due to a substantial number of cows that need to be fetched to the AMS each day." *Id.* at 2241-2242.

## THE LELY ASTRONAUT A4 ROBOTIC
## MILKING SYSTEM

109.    The "E-Manual: Lely Astronaut A4 Operator Manual" (the "E- Manual"), which is

only made available to farmers online, states that "[t]he ASTRONAUT A4 Milking Robot is part

of an automated milking system that milks, feeds, and monitors the health of cows."  According

to the E-Manual, the MQC of "[t]he milking system also examines the quantity and quality of the

milk received from the cows, and if necessary, it separates milk that is contaminated or is not to

the correct standard."

110.    The E-Manual states that "[a] transmitter on each cow enables the system to identify

the cow via a unique number, and a management system maintains specific records for each

cow[,]" which "[t]he milking system uses . . . to manage the milking and feeding of a cow when it

enters the milking robot."  The milking system has "four primary parts[,]" consisting of the milking

robot (one or more), milk storage tank, control system, and compressor.  The milking system also

has three operator interfaces: E-Link, CRS+ and T4C.[3]

111.    A Lely Astronaut A4 robot has two primary parts: (a) "[a] central unit that supplies

power, water, cleaning solutions, regulates pressurized air and applies a vacuum[,]" and (b) "[o]ne

or two robot units where the cows are milked[.]"  The central unit is self-contained and a

configuration with two (2) robots can span a distance of up to thirty (30) meters, according to the

E-Manual.  The schematic below depicts the manner in which a central unit is connected to the

other components and parts of a milking system with two (2) robots:

---

[3]      The E-Link controls the Lely Astronaut A4, the CRS+ user interface controls and monitors the cleaning and
reporting system of all connected Lely Astronaut A4 milking robots, and the T4C farm management software manages
the herd, while managing and controlling the milking system and all connected devices.



KEY: (1) Robot unit one; (2) Robot unit two; (3) T4C network cable, power supply cable, water supply tube, hot cleaning solution supply tube, brush cleaner supply tube, vacuum supply tube, pressurized air supply tube, blow empty milk line tube; (4) T4C network cable; (5) PC with T4C farm management software; (6) CRS+; (7) Central unit; (8) Milk tank; (9) Milk delivery line.

112.   The milking process begins when a cow enters the Lely Astronaut A4 robot through the entry gate.   The cow detection system detects that a cow has entered the robot, and a 3D camera detects the position of the cow.   The tag reader identifies the cow by the tag attached to her neck, ear or leg.   According to the E-Manual, the robot arm then moves to the correct position in two steps: (1) "the 3D camera determines the approximate position of the cow's udder[;]" and (2) "the

robot arm is positioned so the cleaning brushes can clean and massage the teats (pre-treatment)" and, "[a]fter that[,] the robot arm is positioned to attach the teat cups to the teats."

113.   The E-Manual states: "When the teat cups are attached to the teats, they are held in place by suction of the vacuum in the teat cups.  The space between the shell and the liner is alternately brought under vacuum (liner open) and under atmospheric pressure (liner closed). When the liner is open the milk flows from the teat.  When the liner is closed, no milk flows.  The pressure changes stimulate the teat and massages the teat during milking."  "After milking, the teats are sprayed with udder care liquid[,] [t]hen the robot arm is retracted to the start position[, and] [t]he exit gate of the box opens and the cow leaves the box[,]" as per the E-Manual.

## THE LELY ASTRONAUT A4 WAS DEFECTIVE AND PLAGUED WITH REPEATED OPERATIONAL PROBLEMS AND FAILURES

114.   The Lely Astronaut A4 is defective, has numerous, latent and uniform defects in design, material and workmanship, and is plagued with numerous, repeated operational problems that are uniformly experienced by purchasers – all of which Lely had unique, peculiar and superior knowledge even before a single robot was sold, are incapable of being corrected, prevented the Lely Astronaut A4 from functioning, operating and performing as uniformly advertised, marketed and represented by Lely, and caused physical damage to cows and the end milk product produced by the cows – including, but not limited to:

    a.   Pre-Stimulation: the pre-stimulation phase of the Lely Astronaut A4 is defective and fails to operate properly in that all four (4) teats of a cow are not brushed approximately thirty-three percent (33%) of the time and, even when brushed, only eighty to ninety percent (80-90%) of the bacteria present on the teats and udder is removed, a defect which is further compounded by the failure of the robot to adequately and properly dry each teat before the start of the milking process, or discriminate between a dirty and clean udder.

    b.   Teat Cup Attachment: Lely Astronaut A4 robots routinely experience teat cup attachment failures with a teat cup attachment failure rate of two to five percent (2-5%), due to camera, design, encoder, programming and other defects,

causing, on average, about twenty-five (25) minutes of unproductive occupation of the robot a day, reducing the capacity of each robot by at least two percent (2%) and, after an unsuccessful milking attempt, reducing milk yield of the quarter that was not milked by twenty-six percent (26%).

c.  Vacuum Capacity/Reserve: the Lely Astronaut A4 has inadequate vacuum capacity and reserve – a defect exacerbated by the friction caused by corrugated vacuum supply tube, the need to operate the milk pump bladder, and the unnecessary expenditure of energy needed to lift milk from the robot arm vertically upwards into the milk measurement system – and multiple vacuum regulators that oscillate against each other, causing vacuum instability and fluctuations with significant vacuum drops and spikes, resulting in slow milking, reduced milk flow, teat-end issues, delayed milking, longer box times, and liner slips caused by air admission into the teat cups, as a result of which bacteria-contaminated milk droplets, slugs of milk, and other contaminants (e.g., soil, manure, and dust) move backward and impact against the teat end at speeds of 20 m/s (or 44 mph), penetrate the teat canal and enter the teat, all of which adversely affects cow health.

d.  Liners: the liners prematurely and without warning develop cracks, openings, penetrations and tears, and are too large to fit the average teat size of the herds in the United States, resulting in uneven pressure distribution over the surface of the teats with pressure concentrated at the top of the teat where the mouthpiece is located, causing the top of the teat to have prolonged exposure to vacuum, which, among other things, impedes blood flow with blood pooling at the end of the teats, blood engorgement, and severe callosity.

e.  Milk Quality Control: the mastitis detection methods and milk quality control measures of the Lely Astronaut A4, which evaluate the milk being produced by measuring its EC and color, are defective, inadequate and unsatisfactory in that the sensitives and specificities of the evaluation methods for automatic diversion of milk are too low, the use of EC and milk color as detection methods have been concluded to be inadequate for detection of clinical mastitis, abnormal milk, or subclinical mastitis, and thirty percent or more (30%+) of the abnormal milk produced is not automatically diverted away from the milk tank.

f.  Milk Flow/Removal: the Lely Astronaut A4 is programmed to, or otherwise does, overmilk teats, as the end of milking and time delay for removal of the teat cups from each teat is such that udders are milked too dry, resulting in trauma and hyperkeratosis at the teat end.

g.  Post-Stimulation: the Lely Astronaut A4 fails to accurately spray and cover teats with disinfectant of the proper viscosity during post-stimulation due to camera, encoder, programming and other defects, which prevent the robots from determining teat location, and fails to account for the decreased diameter of teats after they have been milked.

35

h. <u>Milk Pump Bladder</u>: the silicone milk pump bladder of the Lely Astronaut A4, which transports milk to the milk tank, is made of defective materials insufficient to withstand their intended, foreseeable and normal use, which cause the milk pump bladder to routinely fail sooner than the life-span of forty-thousand (40,000) milkings uniformly represented by Lely in the Lely A4 Astronaut Owners Maintenance schedule.

i. <u>Radio Frequency Filter</u>: the radio frequency filter of the Lely Astronaut A4, which is responsible for preventing the occurrence of stray voltage, routinely fails resulting in stray voltage issues due to, among defects with the radio frequency filter, the fact that it is never scheduled to be checked or tested and is never scheduled for maintenance, all of which is beyond the capability of a dairy farmer, as it requires specialized equipment.

115.    Lely had peculiar, unique and superior knowledge of these defects and operational problems before a single Lely Astronaut A4 robot was sold based on, among other non-public information, product testing, expert consultations, and the virtually identical defects and problems with the Lely Astronaut A3, which were carried over to the Lely Astronaut A4. To further its deceptive, fraudulent, negligent, misleading and uniform marketing scheme, Lely concealed and, up to the present day, continues to conceal each such defect and operational problem from Plaintiffs and the other dairy farmers who purchased Lely Astronaut A4 robots.

116.    Plaintiff and Class members would not have purchased a Lely Astronaut A4 robot had the aforementioned defects and operational problems – all of which were latent in nature, and not readily apparent obvious or visible to purchasers before their respective Lely Astronaut A4 robots were operational and incorporated into their barns – been disclosed to them and not concealed by Lely for the purpose of inducing them to rely and act in reasonable reliance on the deceptive, false, misleading, incomplete and/or partial information and facts that were disclosed through the representations specified herein.

## A. Pre-Stimulation

117. The milking process and technique of the Lely Astronaut A4 is explained by Lely in the "Farm Management Milk production robotic farms" manual (the "Farm Management Manual"), wherein the first step in the milking process is identified as pre-stimulation, which involves "the removal of dirt [using two brushes], the stimulation of milk ejection, and the monitoring of the udder and the milk for any abnormalities."  When dirt and other contaminants are not sufficiently removed from the teats and udder, the milk becomes contaminated with, for example, soil, manure or dust, not to mention that:

> contamination of the teat orifice can occur easily through bacteria
> on teat surfaces or on contact surfaces of milking equipment[,] . . .
> [making] the cleanliness of the teat and equipment before milking []
> essential.

Exhibit B, p. 2237.

118. Studies and testing show that even thorough cleansing by a Lely Astronaut A4 robot removes only eighty to ninety percent (80 to 90%) of the bacteria present on teats and udder.  This means that ten to twenty percent (10-20%) of the bacteria present on the teats and udder of each cow survives pre-stimulation and is left on the teats and udder when the teat cups are attached, allowing that bacteria to: (a) contaminate the end milk product, (b) increase cross-contamination rates between different cows and/or between different teats of the same cow, and (c) impact against teat ends and penetrate teat canals, increasing udder health problems (as described *supra* herein).

119. This ten to twenty percent (10-20%) failure rate is compounded by the fact, as found by a study discussed in the 2011 Journal of Dairy Science Article, "only 67% of the cleanings were technically successful (i.e., all 4 teats were completely brushed)," Exhibit B, p. 2237, and, even then, only eighty to ninety (80 to 90%) of the bacteria present on teats and udder is removed.  This is further compounded by the fact that the teat cleaning system of the Lely Astronaut A4 does not

adequately and properly "dr[y] teats before the start of the milking process, thus eliminating another opportunity to remove bacteria from the teat orifice." Exhibit B, p. 2237.

120.     According to the National Mastitis Council ("NMC"), one way a milking machine causes the development of mastitis is through the transfer of infectious organisms from cow to cow on teat cup liners (i.e., cross-contamination). The risk of cross-contamination is unreasonably and unnecessarily increased when all of the bacteria present on the teats and udder of each cow is not completely removed during pre-stimulation before coming into contact with the teat cup liners, as well as when there is improper udder preparation, such as failing to adequately and properly dry teats before the start of the milking process.

**B. Teat Cup Attachment**

121.     The Farm Management Manual explains that the "Lely Astronaut applies laser technique to attach the teat cups[,]" which "are detected from different angles by means of a three-beam laser." The front teats are detected first and, once their location is known, the position of the rear teats is determined. The teat cups are attached to the rear teats first followed by the front teats. According to Lely, "[t]he fact that the laser is located further from the teats and at a certain angle also allows the attachment of abnormally shaped teats." Sapphire glass is positioned in front of the laser purportedly to provide protection.

122.     In the Farm Management Manual, Lely represented that "[a]fter attachment of the teat cups, the Lely robot . . . ensures that . . . milk is taken from each quarter." Lely conceals and fails to disclose to dairy farmers that there is a two to five percent (2-5%) teat cup attachment failure rate (Exhibit A, p. 4271), on which occasions one or more teats are either not fully milked or, as frequently is the case, not milked at all. This failure is commonly referred to as "missed

quarters" in the dairy farming industry, and results in cows becoming ill, developing mastitis, and often dying or having to be culled.

123.    This teat cup attachment failure rate means that for every one-hundred twenty (120) milkings, four (4) milkings fail, which translates to about twenty-five (25) minutes of unproductive occupation of the milking robot a day, and directly reduces the capacity of each robot by at least two percent (2%). Exhibit A, p. 4271. Capacity is further reduced when cows return to the robot "after nonmilking visits and failed milkings" and, since the unsuccessful milking attempts involved stimulation of the udder without subsequent milking, a reduction in milk yield also results. Exhibit A, p. 4271. Studies have further found that:

> Following teat cup attachment failure, milk production by the quarter that failed to be milked was 26% lower during the subsequent milking . . . Therefore, any anticipated increase in milk production with an AMS may not be fully realized . . .

Exhibit B, pp. 2230, 2235.

**C.  Vacuum Capacity/Reserve**

124.    A principle of cow milking is that milk should be removed under vacuum, then transported by gravity. As represented by Lely in the Farm Management Manual, the Lely Astronaut A4 "vacuum is delivered by the vacuum pump [located in the central unit, and] is applied to the teats to extract milk from the udder" under vacuum. In the Farm Management Manual, Lely represented that the Lely Astronaut A4 has a "standard vacuum height [of] 44 kPa" (which equates to approximately 13 inHg). The NMC guidelines provide that vacuum height stability should vary by no more than 2 kPa (0.6 inHg).

125.    To maintain vacuum stability, the NMC mandates that the vacuum pump capacity of the system must be a minimum of 35 cfm, plus an additional 3 cfm per milking unit (1 cfm of which represents the effective reserve required per robot to maintain vacuum stability). This

means a Lely Astronaut A4 robotic milking system requires a minimum vacuum pump capacity of at least 38 cfm to operate one robot, and 41 cfm to operate two.  The vacuum capacity of the Lely Astronaut A4 falls below the minimum required capacity and is otherwise inadequate, as found by testing performed on behalf, and at the direction, of Lely.

126.    This was communicated to Lely no later than 2017 (by which time Lely already knew that the Lely Astronaut A4 lacked adequate vacuum capacity and reserve).  Lely was informed that the Lely Astronaut A4 failed every recognized test used to assess vacuum capacity and reserve – a defect of which Lely indicated it was already well-aware, yet failed to correct or cure, because doing so would increase electrical and operational costs and, thus, prevent Lely from pushing its key selling point that the Lely Astronaut A4 "offer[s] the lowest cost of ownership" with "a lower annual energy cost compared to the milking parlor system."

127.    The lack of adequate vacuum capacity is exacerbated by: (a) the use of a corrugated hose, as opposed to a smooth one, as the vacuum supply tube, which increases the friction when moving air through the vacuum supply tube; (b) the need for the vacuum to operate the milk pump bladder; and (c) the expenditure of energy to overcome gravity when lifting milk from the robot arm, through the milk tubes, and vertically upwards into the milk measurement system, which strains the vacuum pump and causes the vacuum level behind the milk to drop.  The image below depicts the milk tubes, and the vertical path the milk is forced to travel.



https://www.lely.com/media/filer_public/23/d9/23d9ee83-fc7e-4c84-acb9-50a30e2d96d0/webres_lely_astronaut_lhqb06416_en.pdf (last visited Feb. 27, 2020).

128.    The design, installation and layout of the milk tubes depicted above also results in bacteria-laden milk and water from the Lelywash performed between milkings – which travels through the milk tubes and is supposed to be drained through the pre-milk device and the milk jar – pooling at the bottom of the U-shaped milk tubes, which contaminates the end milk product and dilutes the end milk product by watering it down, resulting in high bacteria and preliminary incubation counts due to non-hygienic milking and milk processors concluding that the milk product was watered down.

129.    The foregoing is further exacerbated by the fact that the Lely Astronaut A4 has a vacuum regulator in the central unit, and an additional vacuum regulator in each robot connected to the central unit. A vacuum regulator is an automatic valve designed to maintain vacuum stability by admitting air into the pipeline when the vacuum increases above the predetermined level. The

presence of more than one vacuum regulator in the Lely Astronaut A4 causes the vacuum regulators to oscillate against each other, thereby causing vacuum instability and fluctuations with significant vacuum drops and spikes.

130.    The foregoing results in, among a host of other issues, slow milking, reduced milk flow, teat-end issues, delayed milking, longer box times, and liner slips caused by air admission into the teat cups.  As the liner slips (i.e., opens to allow air admission), a reverse pressure gradient is created across the teat canal that causes bacteria-contaminated milk droplets, slugs of milk, and other contaminants (e.g., soil, manure, and dust) to move backward and impact against the teat end at speeds of 20 m/s (or 44 mph), penetrate the teat canal and enter the teat.  This phenomenon is commonly known as an "impact" or "reverse impact."

131.    Impacts increase the infection rate of a herd over the long term by causing bacteria and mastitis-causing organisms to enter the teat canal and access the udder, while also damaging and changing the resistance of the cow's first line of defense: teat skin, teat canal, and mucosal tissue.  This ultimately causes conditions referred to as teat orifice eversion or hyperkeratosis, teat-end lesions, hemorrhagic blisters on teat ends, and teat chapping, all of which allow organisms and pathogenic bacteria to colonize and multiply in the damaged or changed tissue, leading to intra-mammary infections, among other health issues.

132.    The lack of adequate vacuum capacity and the other issues identified above also result in cow discomfort, vacuum spikes increasing liner overpressures (i.e., liner pinch on the teat ends), and the cow being exposed to high vacuum levels during fluctuation spikes, causing cow discomfort and preventing an opportunity to safely increase vacuum levels to milk cows faster.  In addition, local discomfort and pain caused by vacuum fluctuation spikes due to inadequate vacuum

capacity and reserve lead to neurohormonal responses, which suppress immune function and increase the likelihood of disease, as well as interfering with milk ejection or "letdown."

**D. Liners**

133.    The liner is composed of a barrel and mouthpiece, which is used to hold the liner onto the teats when vacuum pressure is not being applied.  When the liner is inserted in the teat cup an annular space is created between the liner and the shell of the teat cup, which is referred to as the pulsation chamber.  The opening and closing of the liner to remove milk from the udder is controlled by the pulsation system and, according to the Farm Management Manual, "[t]he combination of vacuum and the opening and closing of the liners plays an important role in the removal of milk from the udder."

134.    The factors affecting liner performance and quality include the diameter of the liner in relation to the diameter of the teats, the shape of the mouthpiece and barrel, wall thickness, and elasticity.  The liner should be adapted to fit the average teat size of the herd.  Lely manufacturers and sells two types of liners – a silicone liner with a life-span of 10,000 milkings, and a rubber liner with a life-span of 2,500 milkings, according to the representations of Lely in the Farm Management Manual – neither of which are adapted to fit the average teat size of herds in the United States, or the herds of purchasers of Lely Astronaut A4 robots.

135.    Liner size is important because when the liner is closed, it massages the teat and neutralizes the sucking effect in the opening phase of the liner.  The liners offered by Lely are too large to fit the average teat size of the herds in the United States, resulting in an uneven pressure distribution over the surface of the teats with pressure concentrated at the top of the teat where the mouthpiece is located.  This causes the top of the teat to have prolonged exposure to vacuum,

which, among other things, impedes blood flow with blood pooling at the end of the teats, blood

engorgement, and severe callosity (i.e., bulging teat orifices).

136.    The liners offered by Lely are also defective and suffer from operational problems

in that they develop cracks, openings, penetrations and tears well-before the expiration of the life-

span represented by Lely, resulting in milk escaping into the pulsation chamber and, ultimately,

the vacuum supply tube where a thick layer of milk solids remains after the water in the milk

evaporates, which causes blockages, and increases the friction, in the vacuum supply tube (which

Lely never schedules for cleaning, maintenance, or service), exacerbating the problems stemming

from the lack of adequate vacuum capacity and reserve.

**E. Milk Quality Control (MQC)**

137.    The MQC is supposed to continuously monitor the milk being produced "per

quarter" during the milking process, and provide "vital information on mastitis, fat and protein and

lactose for managing milk quality and cow health, allowing [the farmer] to respond quickly and

achieve optimal milk quality" by measuring, among other things, the EC and color of the milk

being produced.  Lely uniformly represented that the MQC functions as a mastitis detection device,

allowing farmers "to follow the udder health of each cow per quarter via the management

software," according to the Farm Management Manual, while:

> [b]lood milk, colostrum and milk with a colour deviation (caused by
> mastitis, for example) are easily traced and, if required,
> automatically separated.

138.    The mastitis detection methods and milk quality control measures used by the Lely

Astronaut A4 are defective, inadequate and unsatisfactory.  First, the sensitives and specificities

of the evaluation methods for automatic diversion of milk used in this milking system have been

found to be too low.  Second, the use of EC as a detection method "has been concluded to be

inadequate for detection of clinical mastitis, abnormal milk, or subclinical mastitis." Exhibit C, p. 121 (internal citations omitted). Third, studies have "concluded that mastitis detection based on milk colour was unsatisfactory."

139.   The Acta Argiculturae Scandinavica Journal published an article titled, "Accuracy and reliability of mastitis detection with electrical conductivity and milk colour measurement in automatic milking," a copy of which is annexed hereto as Exhibit C. That article distilled the results of a study analyzing two different mastitis detection systems, including the "mastitis detection system . . . compris[ing] quarter-based EC and milk colour measurements with MQC® (Lely Industries NV, Maasland, The Netherlands)." The article discussed the results of the study, stating, in pertinent part, as follows:

> The sensitivity of EC in detecting quarters with high [somatic cell count] was fairly low, agreeing with earlier research on subclinical mastitis. The correlation between [somatic cell count] and EC was low, as also shown earlier.
>
> * * *
>
> In our study, none of the methods was completely satisfactory in identifying clinically affected quarters. Most of the clinical cases were detected, but the milk was not diverted automatically on the day on which the farmer diagnosed clinical mastitis. The proposed goal of 70% sensitivity for diverting abnormal milk automatically was not achieved.

Exhibit C, pp. 124-25.

140.   The detection methods of the MQC used by Lely Astronaut robots, including Lely Astronaut A4 robots, only detected "14/17 cases" of clinical mastitis on the day of diagnosis by the farmer, which equates to a detection failure rate of approximately 17.65% and, even in those cases that were detected, "the milk was not diverted automatically on the day on which the farmer diagnosed clinical mastitis" and, as a result, thirty percent or more (30%+) of the abnormal milk

produced was not automatically diverted in direct contradiction to the uniform representation of Lely that abnormal milk is "easily traced and, if required, automatically separated."

141.    This results in dairy farmers not being able "to supply only first class milk," as uniformly represented by Lely.  There are four classes of milk.  First class or Class I milk is the highest valued milk used for fluid consumption, according to the American Dairy Products Institute.  To qualify as Class I, milk must meet the minimum standards and requirements for Grade A milk production and processing outlined in the Grade A Pasteurized Milk Ordinance published by the Food and Drug Administration.  So, the phrase "first class milk" is not mere puffery, but a term of art in the dairy industry that refers to Grade A milk.

**F.  Milk Flow/Removal**

142.    According to the Farm Management Manual, "[t]he teat cups are removed depending on the milk flow[,]" which "is monitored through a milk flow indicator."  Once a quarter has been completely milked, the teat no longer fills with milk and the diameter of the teat remains small, resulting in more space between the wall and the teat.  This causes the vacuum pressure at the mouthpiece of the liner to build-up, while the robot continues to attempt to milk the teat even though milk is no longer being secreted from the udder (i.e., overmilking), resulting in trauma and hyperkeratosis at the teat end.

143.    To avoid overmilking, the well-accepted industry standard is that there should be an easily obtainable stream of milk remaining in each quarter after the milking process has been completed and the teat cups have been removed.  In contravention to this industry standard, the Lely Astronaut A4 is programmed to overmilk teats for up to forty-five (45) seconds or more; that is, the end of milking and the time delay for removal of the teat cups is such that udders are milked

too dry to the point where a quarter has been completely milked with either no milk remaining in that quarter, or no easily obtainable stream of milk remaining.

## G. Post-Stimulation

144.    The risk of udder infection is increased when teats are not sprayed and well-covered with a disinfectant of the proper viscosity directly after milking.  The Lely Astronaut A4 fails to accurately spray and cover teats during post-stimulation due to camera, encoder, programming and other defects, which prevent A4 robots from determining teat location, and fails to account for the decreased diameter of teats after they have been milked.  Moreover, the disinfectant fluid that Lely manufacturers, sells and requires purchasers to use under the threat of ceasing maintenance and service is highly viscous and, thus, fails to adequately cover and disinfect teats.

145.    The failure to accurately and adequately spray and cover teats with a disinfectant of the proper viscosity directly after milking increases the risk of cross-contamination, while adversely affecting teat and udder health by causing chapped teats, failing to remove contagious mastitis-causing pathogens on the teat surface – including, but not limited to, any just inside the opened teat canal that were transferred during milking from infected milk residues from inside the liner, or that penetrated the teat canal as a result of impacts during the milking process, before they have a chance to colonize and infect the teats – mastitis, and other health conditions.

## H. Milk Pump Bladder

146.    The milk pump bladder of the Lely Astronaut A4 transports milk from the milk jar to the milk tank, using "[a]lternating vacuum and pressurized air, applied on the outside of the silicone bladder in the milk pump cartridge," according to the E-Manual, which further strains the vacuum pump and contributes to vacuum fluctuations.  Moreover, the bladder is made of defective materials insufficient to withstand their intended, foreseeable and normal use, which cause the

milk pump bladder to routinely fail sooner than the life-span of forty-thousand (40,000) milkings

uniformly represented by Lely in the Lely A4 Astronaut Owners Maintenance schedule.

**I.   Radio Frequency Filter**

147.   The radio frequency filter of the Lely Astronaut A4 is responsible for preventing

the occurrence of stray voltage.  The radio frequency filter routinely fails resulting in stray voltage

issues due to, among defects with the radio frequency filter, the fact that it is never scheduled to

be checked or tested, and is never scheduled for maintenance, all of which is beyond the capability

of a dairy farmer, as it requires specialized equipment.  The only way in which a dairy farmer

exercising reasonable diligence learns that the radio frequency filter has failed is when a stray

voltage event occurs by which time any resultant damage cannot be prevented.

**LELY CONCEALED MATERIAL FACTS ABOUT THE LELY ASTRONAUT A4**

148.   Even after becoming aware of, and receiving, the aforementioned articles and other

information, performing its own internal studies, and consulting with experts, Lely continued to

make representations and conceal material facts about the Lely Astronaut A4 and, instead of

ceasing sales of the Lely Astronaut A4, continued its deceptive and fraudulent uniform marketing

scheme.

149.   Despite its knowledge to the contrary, Lely continued to uniformly represent that

the Lely Astronaut A4 worked as represented, while concealing the data, documents, information,

logs and/or records it maintains of the defects and problems with the Lely Astronaut A4 robots

that had been and were then operational, which it knew would prove each representation specified

herein to be deceptive, false and misleading.

150.   Lely had knowledge of the defects and problems with the Lely Astronaut A4 that

was superior to Plaintiffs and other dairy farmers.  First, Lely (through itself, its parent or a related

company) designed, patented and manufactured the Lely Astronaut A4, was responsible for programming the software that operated the Lely Astronaut A4 and controlled its functions and, thus, created the defects and problems with the Lely Astronaut A4.

151.   Second, the Journal of Dairy Science and Acta Argiculturae Scandinavica Journal articles were available to, and in the possession of, Lely and, as noted therein, the management software for, and studies conducted of the components, equipment, programming and software of, the Lely Astronaut A4 – which Lely concealed from Plaintiffs and other dairy farmers – revealed that the uniform representations made by Lely were deceptive, false and misleading.

152.   Third, at all times relevant herein, including before even a single Lely Astronaut A4 robot was sold, Lely knew from testing the Lely Astronaut A4, or would have known had adequate and proper testing of the Lely Astronaut A4 been performed for a sufficient period of time, that the Lely Astronaut A4 was defectively designed, not free from defects in material and workmanship, and did not function or operate as represented.

153.   For example, since special testing equipment and careful measurement technique are required to measure vacuum capacity and reserve, no dairy farmer exercising reasonable diligence could determine that the Lely Astronaut A4 has inadequate vacuum capacity and reserve, whereas Lely is fully capable of, and equipped to, assess and test vacuum capacity and, based on its representations of "robot capacity," has seemingly done so.

154.   Fourth, the Lely Astronaut A3 was plagued by virtually identical defects and operational problems, which Lely then carried over to, and incorporated into, the Lely Astronaut A4. Since the Lely Astronaut A3 was introduced in 2005, Lely had unique, peculiar and superior knowledge of the defects and operational problems specified herein – including, but not limited to, the those identified in paragraphs 114-147 – before any Lely Astronaut A4 robots were sold.

155.    Once Lely began selling Lely Astronaut A4 robots, it had numerous product feedback sources from which to learn, and from which it did learn, that the Lely Astronaut A4 was plagued with defects and did not operate as uniformly represented by Lely, all of which Lely intentionally concealed and failed to disclose in furtherance of its deceptive, fraudulent and misleading marketing scheme.

156.    First, Lely collects, and/or has access to, real-time data from the Lely Astronaut A4 robots that are in operation on dairy farms in the United States and across the world, detailing the defects and problems with, as well as the performance and failures of, those Lely Astronaut A4 robots (i.e., the T4C Data), which consistently revealed that the Lely Astronaut A4 was defective, and did not function or operate as represented.

157.    Second, since Lely only sells the Lely Astronaut A4 through approved, authorized and/or wholly owned dealers, some of which are also Lely service technicians, Lely knew or, in the absence of willful blindness, would have known that the Lely Astronaut A4 was defective and did not operate as represented from dealers and service technicians, as well as from service and/or repair order information.

158.    Lely concealed the foregoing articles, data, information and material facts, establishing – in contradiction to its representations – that, among other things, the Lely Astronaut A4: did not achieve an average of ten percent (10%) more milk a year than conventional milking systems; did not milk sixty (60) or more cows per robot an average of 2.6 times a day; did not achieve one-hundred eighty (180) milkings per robot a day; did not harvest five thousand (5,000) pounds of milk a day; only brushed all four (4) teats of a cow a mere sixty-seven percent (67%) of the time and, even then, only removed eighty to ninety percent (80-90%) of the bacteria present on the teats and udder; failed to adequately dry teats before the start of the milking process; could

not discriminate between a dirty and clean udder; routinely experienced teat cup attachment failures resulting in missed quarters; and did not improve cow health, reduce feed costs, detect cases of mastitis, automatically divert abnormal milk away from the milk tank, adequately disinfect teats during post-stimulation, or have adequate vacuum capacity and reserve.

159.   Lely compiled some of this data and information into an internal document, which was not publicly distributed to dairy farmers, referred to as an "FMS Farm Scan." An FMS Farm Scan dated March 29, 2017 reveals that the Lely Astronaut A4 suffered from repeated failures and critical alarms and, in direct contradiction to its uniform representations, does not: milk sixty (60) or more cows per robot an average of 2.6 times a day; achieve one-hundred eighty (180) milkings per robot a day; or harvest five thousand (5,000) pounds of milk a day.

160.   In light of its access to and possession of such non-public information, Lely has and held itself out as having peculiar, unique and specialized knowledge about the abilities, benefits, capabilities, defects, failures, performance, problems, operation and workings of the Lely Astronaut A4, which was not available to, and was concealed from, Plaintiffs and other dairy farmers to whom the Lely Astronaut A4 was sold.

161.   Lely concealed its peculiar, unique and specialized knowledge about the Lely Astronaut A4 to prevent the unearthing of data and facts it knew would prove each of the representations it made, and instructed its agents, servants and/or employees to make, about the Lely Astronaut A4 to be false, so that it could continue to deceive, mislead, and fraudulently induce dairy farmers to purchase Lely Astronaut A4 robots.

162.   Lely knew that Plaintiffs and most of the dairy farmers to whom the representations specified herein were made, were not technologically sophisticated and, in light of the peculiar, unique and specialized knowledge about the Lely Astronaut A4 that Lely has and held itself out

as having, would reasonably rely thereon to their detriment by purchasing one or more Lely Astronaut A4 robots.

163.    No Plaintiff or dairy farmer would have purchased the Lely Astronaut A4 had the aforementioned information and material facts been disclosed to them and not concealed by Lely with the intent to defraud them and for the purpose of inducing them to rely and act in reasonable reliance on the deceptive, false, misleading, incomplete and/or partial information and facts that were disclosed through the representations specified herein.

### THE LELY ASTRONAUT A5

164.    On or about April 10, 2018, Lely introduced an upgrade to the Lely Astronaut A4 known as the Lely Astronaut A5 "at their head office in The Netherlands," according to the announcement posted on its publicly accessible website (the "Press Release").  The announcement states that the Lely Astronaut A5 now provides "consistent milking," which is an implicit admission of the inconsistent milking provided by the Lely Astronaut A4 due to the vacuum fluctuations caused by its inadequate vacuum capacity and reserve.

165.    The Press Release also boasted that "[w]ith the new Teat Detection System (TDS), post-milking teat spraying has been improved by pre-scanning the udder before spraying, ensuring optimal udder hygiene and limiting the risk of contamination," tacitly admitting the existence and its knowledge of the defective post-stimulation provided by the Lely Astronaut A4 – which, among the other defects specified herein, failed to pre-scan the udder after milking a cow to determine teat location and account for the decreased diameter of teats after they have been milked.

### PLAINTIFF LYNN KIRSCHBAUM

166.    On or about December 24, 2015, Plaintiff Kirschbaum entered into an agreement with Lely (the "Kirschbaum Agreement"), pursuant to which he agreed to purchase from Lely two

(2) defect-free Lely Astronaut A4 robots and other related milking equipment, which were designed, developed, manufactured, distributed and installed by Lely for the purpose of milking cows, for the sum of approximately $388,365.00.

167.    At the behest of Lely, Kirschbaum incurred substantial costs to design and construct a new barn that was specifically and necessarily designed to accommodate and facilitate the use of the Lely Astronaut A4 based on blueprints, plans, specifications, suggestions and/or other recommendations provided by Lely, through its agents, servants, employees, and/or authorized dealers, including Fitzgerald and Lange. Since the barn was specifically designed to be a voluntary milking facility, it was not optimized to be used to milk cows by any alternative method.

168.    The costs incurred by Kirschbaum to design and construct the addition to their existing barn included, but were not limited to, costs for building, construction, design, architectural work, site work, electrical work, concrete work and other necessary work, which brought the total costs incurred by Kirschbaum for the purchase and installation of the Lely Astronaut A4 robots and equipment to an amount well exceeding $1,100,000.00.

169.    Kirschbaum became interested in the Lely Astronaut A4 in Late 2014, when he viewed the marketing materials discussed herein (or substantially similar versions).  To induce Kirschbaum to purchase the Lely Astronaut A4, Lely through its agents, servants, employees, and/or authorized dealers, including, but not limited to, Fitzgerald and Lange, arranged for him to visit two (2) farms on which Lely Astronaut A4 robots were in operation in or about November-December 2015, during which it aggressively marketed the purported benefits, features and past performance of the Lely Astronaut A4 by repeating the uniform representations specified herein.

170.    Acting in reasonable reliance on the foregoing – as well as the representations detailing the past performance of Lely Astronaut A4 robots, and expressing their purported

abilities, capabilities and performance in terms specific numbers or percentages (e.g., "10% more milk per year," "harvest[s] 5,000 pounds (2,268 kg) of milk per day," "achieve[s] 180 milkings per day," etc.) and given the material facts concealed by Lely – Kirschbaum, to his detriment, entered into the Kirschbaum Agreement and incurred substantial costs to purchase two Lely Astronaut A4 robots and to design and build a new barn to house the Lely Astronaut A4.

171.    Once the new barn was completed, the Lely Astronaut A4 robot was installed and incorporated into the new addition to the barn and, on or about September 29, 2016, Kirschbaum began using the Lely Astronaut A4 robots.

172.    The Lely Astronaut A4 robots failed to work as represented, were defective, and had numerous, repeated operational problems and failures of which Lely had unique, peculiar and superior knowledge at or prior to the sale and delivery of the Lely Astronaut A4 to Kirschbaum, including the defects and operational problems discussed in detail herein at paragraphs 114-147.

173.    The defects and problems with the Lely Astronaut A4 robots manifested in or about August-September of 2018, when the preliminary incubation count of the milk produced by the cows began to steadily increase, reaching levels exceeding 130,000 cfu/mL by October of 2019 – due to the failure of the Lely Astronaut A4 robots to thoroughly disinfect the "whole system" "after cleaning each cow" in direct contradiction to the uniform representations of Lely – as a result of which Prairie Farms Dairy, the cooperative to which Kirschbaum supplies his milk, began imposing a penalty on his milk product in or about September of 2019.

174.    The defects and problems with the Lely Astronaut A4 robots further manifested in or about Fall of 2018, when the somatic cell count of the milk produced by the cows began to steadily increase, reaching levels exceeding 900,000 cells/mL by October of 2019 – which exceeds the 750,000 cells/mL limit for Grade A milk in Wisconsin – due to the high incidence of mastitis

caused by the defects with the Lely Astronaut A4 robots identified herein, including, but not limited to, the lack of adequate vacuum capacity and reserve, as a result of which Prairie Farms Dairy began imposing a separate penalty on his milk product in or about September of 2019.

175.    The high incidence of mastitis was also caused and exacerbated by the defective pre-stimulation – which, among other defects, failed to properly brush all four (4) teats of each cow approximately thirty-three percent (33%) of the time and, even when it brushed each teat, failed to remove a staggering ten to twenty percent (10-20%) of the bacteria present on the teats and udder – and the defective post-stimulation, which failed to accurately and adequately spray and cover teats with a disinfectant of the proper viscosity directly after milking.

176.    This was further exacerbated by failure of the MQC to detect cases of clinical and subclinical mastitis, or adequately and properly examine the quantity and quality of the milk received from the cows, and when necessary, separate milk that is contaminated or is not to the correct standard, all of which resulted in an end milk product that was contaminated by high somatic cell count levels, which prevent Kirschbaum from being able to "supply only first class" or Grade A milk, as uniformly promised by Lely.

177.    As a result of the defects with the Lely Astronaut A4 specified herein, the Lely Astronaut A4 robots also failed to: provide production increases of ten to fifteen percent (10-15%) with labor productivity increases; milk sixty (60) cows 2.6 times a day; achieve one-hundred eighty (180) milkings or harvest five-thousand (5,000) pounds of milk a day; reduce feed or labor costs; have an extra robot capacity of ten to fifteen percent (10-15%); disinfect the whole system after milking each cow; and eliminate bacteria or prevent cross-contamination.

178.    The foregoing, among other things, caused: damage to the cows owned by Kirschbaum by damaging their teats, while also increasing his mastitis and culling rates; damage

to the end milk product by increasing the somatic cell count thereof to levels exceeding 900,000 cells/mL, which exceeds the legal maximum for Grade A milk in Wisconsin and, thus, prevented Kirschbaum from supplying only first-class milk; and decreased milk production, all of which resulted in thousands of dollars of property damage and lost profits.

179.   The foregoing also caused excessively high preliminary incubation counts in the milk produced by Kirschbaum, because, among other defects specified herein, the Lely Astronaut A4 robots failed to thoroughly disinfect the "whole system" "after cleaning each cow" in direct contradiction to the uniform representations of Lely.  In addition, the Lely Astronaut A4 robots had drastically higher-than-represented box times, which adversely effected the capacity of each Lely Astronaut A4 robot, causing further financial harm to Kirschbaum.

180.   As a result of the defects and operational problems with the Lely Astronaut A4 robots, each robot required more than the "maximum of four maintenance calls per year" uniformly represented by Lely, and the costs to service, maintain, repair and operate robot far exceeded the four thousand ($4,000) annual amount of those costs uniformly represented by Lely.  The annual energy costs incurred to operate the robots nearly doubled that incurred to operate their former milking parlor, depriving them of the "lowest cost of ownership" promised by Lely.

181.   The defects and problems with, and failures of, the Lely Astronaut A4 robots are the same defects, problems and failures of which Lely had peculiar, unique and superior knowledge from the T4C Data, the journal articles specified herein, expert consultations, information from other dairy farmers, the firsthand observations of its authorized dealers, service technicians and other employees, and the other sources identified herein, all of which was concealed from Kirschbaum and other dairy farmers.

182.    The defects, problems and failures experienced by Kirschbaum are representative of the problems and failures of which Lely knew or should have known that other dairy farmers had consistently and routinely experienced with the Lely Astronaut A4 from even before a single robot was sold up to, through and including the date on which Lely, through its agents, servants, employees and/or authorized dealers, induced Kirschbaum to enter into Kirschbaum Agreement, yet concealed from Kirschbaum and other similarly situated dairy farmers with the intent to defraud them.

183.    The defects and problems with the robot were latent in nature, not disclosed by Lely to Kirschbaum, not readily apparent, obvious or visible to Kirschbaum before the robot was operational and incorporated into their barn, and could not have been discovered by Kirschbaum upon reasonable diligence and inspection prior to the defects manifesting themselves in or about March-April of 2018 and thereafter, when the physical damage to their cows become observable and the quality of their milk product began to steadily decline.

184.    The defects, problems and failures of the Lely Astronaut A4 were not caused or contributed to by variation in farm animals, management practices or other conditions beyond the control of Lely or in the control of Kirschbaum and, instead, were caused by the defects with the Lely Astronaut A4 created by Lely, over which it had control, of which it had peculiar, unique and superior knowledge at all times relevant herein, and all of which it concealed from Kirschbaum with the intent to defraud them and other similarly situated dairy farmers.

185.    Lely did not offer to provide any minimum adequate remedy to compensate him for his actual damages caused by, the Lely Astronaut A4 robots (within a reasonable time or otherwise), which were defective and failed to conform with the uniform advertisements, marketing and representations detailed herein, despite having knowledge of each defect and

problem with the Lely Astronaut A4 robots purchased by Kirschbaum, which were delivered, installed and repeatedly serviced by Lely.

186.     The Lely Astronaut A4 was less efficient, productive and profitable than the conventional milking system previously used to milk cows on Kirschbaum Farm; caused Kirschbaum to suffer significant property damage in that the health of the cows was negatively impacted, while numerous cows were lost due to culling and mastitis, thereby reducing their herd size and milk production capacity; and, overall, worsened caused financial turmoil for Kirschbaum and worsened their quality of life.

187.     Kirschbaum were also damaged in that he paid an artificially and fraudulently inflated purchase price for the Lely Astronaut A4 robots, which inappropriately reflected the false information uniformly represented by Lely, other dairy farmers in the United States, and the general public. This caused the purchase price of the Lely Astronaut A4 to be inflated beyond its value, meaning every purchaser, including Kirschbaum, was injured by paying too much when, had the truth been known, they would have paid a lower price or not purchased at all.

**PLAINTIFF JARED KRUGER**

188.     On or about March 31, 2015, Plaintiff Kruger was induced, as described herein, into entering an agreement with Lely (the "Kruger Agreement"), pursuant to which Kruger agreed to purchase from Lely one (1) defect-free Lely Astronaut A4 robot and other related milking equipment, which were designed, developed, manufactured, distributed and installed by Lely for the purpose of milking cows, for the sum of approximately $214,142.00.

189.     At the behest of Lely, Kruger incurred substantial costs to design and construct an addition to his existing barn that was specifically and necessarily designed to accommodate and facilitate the use of the Lely Astronaut A4 based on blueprints, plans, specifications, suggestions

and/or other recommendations provided by Lely, through its agents, servants, employees, and/or authorized dealers, including Luebke. Since the barn was specifically designed to be a voluntary milking facility, it was not optimized to be used to milk cows by any alternative method.

190.   The costs incurred by Kruger to design and construct the addition to his existing barn included, but were not limited to, costs for building, construction, design, architectural work, site work, electrical work, concrete work and other necessary work, which brought the total costs incurred by Kruger for the purchase and installation of the Lely Astronaut A4 robot and equipment to an amount well exceeding $300,000.00.

191.   To induce Kruger to purchase the Lely Astronaut A4, Lely, through its agents, servants, employees, and/or authorized dealers, including Luebke, organized, and arranged for him to take, a trip to two dairy farms in Winona County, Minnesota, both of which had recently installed Lely Astronaut A4 robots within the preceding six (6) to eight (8) weeks, during which it aggressively marketed the purported benefits, features and past performance of the Lely Astronaut A4 by, among other things, repeating the uniform representations specified herein.

192.   Kruger was only taken to dairy farms on which Lely Astronaut A4 robots were recently installed, where the defects and problems with the robots, which are latent in nature and take several months or more to manifest, were not evident.  For example, the lack of adequate vacuum capacity and reserve causes liner slips, which, among other things, cause bacteria-contaminated milk droplets, slugs of milk, and other contaminants to move backward and impact against the teat end at high speeds, penetrate the teat canal, and enter the teat.

193.   These impacts increase the infection rate of a herd over the long term by causing bacteria and mastitis-causing organisms to enter the teat canal and access the udder, while also damaging and changing the resistance of the cow's teat skin, teat canal, and mucosal tissue, which

allows organisms and pathogenic bacteria to colonize and multiply in the damaged or changed tissue, leading to intra-mammary infections, among other health issues. The consequences of impacts take time to manifest, and do not automatically occur as the result of every impact.

194.   There is, however, a positive correlation between the number of times a cow is milked by a Lely Astronaut A4 robot and the occurrence of liner slips resulting in impacts, as well as the number of impacts a cow experiences and the incidence of the foregoing adverse consequences caused by impacts. This means that the more times a cow is milked by a Lely Astronaut A4 robot, the more impacts it will experience and, with each passing impact, the more likely the cow is to suffer the adverse consequences set forth above and elsewhere herein.

195.   In sum, Lely chose to only showcase recently installed Lely Astronaut A4 robots to make it appear as though the robots were defect-free and operated as uniformly represented, all the while knowing that it was simply showcasing the robots during their latency period before the defects and problems therewith manifested, which allowed Lely to further its deceptive, fraudulent and negligent marketing scheme, and sell the Lely Astronaut A4 at an inflated price point far exceeding its actual value.

196.   Acting in reasonable reliance on the foregoing – as well as the representations detailing the past performance of Lely Astronaut A4 robots, and expressing their purported abilities, capabilities and performance in terms specific numbers or percentages (e.g., "10% more milk per year") and given the material facts concealed by Lely – Kruger, to his detriment, entered into the Kruger Agreement and incurred substantial costs to purchase a Lely Astronaut A4 robot and to design and build an addition to his barn to house the Lely Astronaut A4.

197.   Once the addition to the barn was completed, the Lely Astronaut A4 robot was installed and incorporated into the new addition to the barn and, on or about November 13, 2015, Kruger began using the Lely Astronaut A4 robot.

198.   The Lely Astronaut A4 failed to work as represented, was defective, and had numerous, repeated operational problems and failures of which Lely had unique, peculiar and superior knowledge at or prior to the sale and delivery of the Lely Astronaut A4 to Kruger, including the defects and operational problems discussed in detail herein at paragraphs 114-147.

199.   The defects and problems with the Lely Astronaut A4 robot did not manifest until in or about March of 2016, when the somatic cell count of the milk produced by the cows being milked by the robot began to steadily increase, reaching levels exceeding 1,000,000 cells/mL by August of 2016 – which exceeds the legal maximum for Grade A milk in the United States – due to the high incidence of mastitis caused by the defects with the Lely Astronaut A4 robot identified herein, including, but not limited to, the lack of adequate vacuum capacity and reserve.

200.   The high incidence of mastitis was also caused and exacerbated by the defective pre-stimulation – which, among other defects, failed to properly brush all four (4) teats of each cow approximately thirty-three percent (33%) of the time and, even when it brushed each teat, failed to remove a staggering ten to twenty percent (10-20%) of the bacteria present on the teats and udder – and the defective post-stimulation, which failed to accurately and adequately spray and cover teats with a disinfectant of the proper viscosity directly after milking.

201.   This was further exacerbated by failure of the MQC to detect cases of clinical and subclinical mastitis, or adequately and properly examine the quantity and quality of the milk received from the cows, and when necessary, separate milk that was contaminated or was not to the correct standard, all of which resulted in an end milk product that was contaminated by high

somatic cell count levels, which prevent Kruger from being able to "supply only first class" or Grade A milk, as uniformly promised by Lely.

202.   As a result of the defects with the Lely Astronaut A4 specified herein, the Lely Astronaut A4 robot also failed to: provide production increases of ten to fifteen percent (10-15%) with labor productivity increases; milk sixty (60) cows 2.6 times a day; achieve one-hundred eighty (180) milkings or harvest five-thousand (5,000) pounds of milk a day; reduce feed or labor costs; have an extra robot capacity of ten to fifteen percent (10-15%); disinfect the whole system after milking each cow; and eliminate bacteria or prevent cross-contamination.

203.   The foregoing, among other things, caused: damage to the cows owned by Kruger by damaging their teats, while also increasing their mastitis and culling rates; damage to the end milk product supplied by Kruger by increasing the somatic cell count thereof to levels exceeding 1,000,000 cells/mL, which exceeds the legal maximum for Grade A milk in the United States and, thus, prevented Kruger from supplying only first-class milk; and decreased milk production, all of which resulted in thousands of dollars of property damage and lost profits.

204.   The foregoing also caused excessively high preliminary incubation counts in the milk produced by Kruger, because the Lely Astronaut A4 robots failed to thoroughly disinfect the "whole system" "after cleaning each cow" in direct contradiction to the uniform representations of Lely.  In addition, the Lely Astronaut A4 robots had drastically higher-than-represented box times, which adversely effected the capacity of each Lely Astronaut A4 robot, causing further financial harm to Kruger.

205.   As a result of the foregoing, Kruger stopped using the Lely Astronaut A4 robot on or about December 18-19, 2016.  During the thirteen months it was in operation, the Lely Astronaut A4 robot required far more than the "maximum of four maintenance calls per year" uniformly

represented by Lely, and the annual costs to service, maintain, repair and operate robot during that time period exceeded fifteen thousand dollars ($15,000), which far exceeds the four thousand ($4,000) annual amount of those costs uniformly represented by Lely.

206.    A survey of dairy farmers – jointly conducted by dairy extension educators at the University of Wisconsin, University of Minnesota and Penn State University, which was published in Hoard's Dairyman on or about August 26, 2019 in an article titled "Robot's annual costs nearly double with age" – confirms that the excessively high costs incurred by Kruger to service, maintain and repair the Lely Astronaut A4 were uniformly experienced by other similarly situated dairy farmers in the United States, a material fact that Lely concealed.[4]  The article states:

The estimated average repair and maintenance costs, as a function of the age of the AMS units, are shown in the figure.



207.    The defects and problems with, and failures of, the Lely Astronaut A4 robot are the same defects, problems and failures of which Lely had peculiar, unique and superior knowledge from the T4C Data, the journal articles specified herein, expert consultations, information from other dairy farmers, the firsthand observations of its authorized dealers, service technicians and

---

[4]     *Robot's annual costs nearly double with age*, HOARD'S DAIRYMAN (Aug. 26, 2019), *available at* https://hoards.com/article-26149-robots-annual-costs-nearly-double-with-age.html.

other employees, and the other sources identified herein, all of which was concealed from Kruger and other dairy farmers.

208. The defects, problems and failures experienced by Kruger are representative of the problems and failures of which Lely knew or should have known other dairy farmers had consistently and routinely experienced with the Lely Astronaut A4 from even before a single robot was sold up to, through and including the date on which Lely, through its agents, servants, employees and/or authorized dealers, induced Kruger to enter into the Kruger Agreement, yet concealed from Kruger and other similarly situated dairy farmers with the intent to defraud them.

209. The defects and problems with the robot were latent in nature, not disclosed by Lely to Kruger, not readily apparent, obvious or visible to Kruger before the robot was operational and incorporated into his barn, and could not have been discovered by Kruger upon reasonable diligence and inspection prior to the defects manifesting themselves in or about March of 2016 and thereafter, when the physical damage to his cows become observable and the quality of his milk product began to steadily decline.

210. The defects, problems and failures of the Lely Astronaut A4 were not caused or contributed to by variation in farm animals, management practices or other conditions beyond the control of Lely or in the control of Kruger and, instead, were caused by the defects with the Lely Astronaut A4 created by Lely, over which it had control, of which it had peculiar, unique and superior knowledge at all times relevant herein, and all of which it concealed from Kruger with the intent to defraud him and other similarly situated dairy farmers.

211. Lely did not offer to provide Kruger with any minimum adequate remedy sufficient to compensate him for his actual damages caused by, the Lely Astronaut A4 robot (within a reasonable time or otherwise), which was defective and failed to conform with the uniform

advertisements, marketing and representations detailed herein, despite having knowledge of each defect and problem with the Lely Astronaut A4 robot purchased by Kruger, which were delivered, installed and serviced by Lely.

212.   The Lely Astronaut A4 was less efficient, productive and profitable than the conventional milking system previously used to milk cows on the Kruger Farm; caused Kruger to suffer significant property damage in that the health of the cows was negatively impacted, while numerous cows were lost due to culling and mastitis, thereby reducing their herd size and milk production capacity; and, overall, worsened caused financial turmoil for Kruger and worsened his quality of life, as well as that of his wife and four young children.

213.   Kruger was also damaged in that he paid an artificially and fraudulently inflated purchase price for the Lely Astronaut A4 robot, which inappropriately reflected the false information uniformly represented by Lely to Kruger, other dairy farmers in the United States, and the general public.  This caused the purchase price of the Lely Astronaut A4 to be inflated beyond its value, meaning every purchaser, including Kruger, was injured by paying too much when, had the truth been known, they would have paid a lower price or not purchased at all.

**PLAINTIFFS DONNA AND ROBERT KOON**

214.   On or about December 23, 2015, Plaintiffs Koons were induced, as described herein, into entering an agreement with Lely (the "Koons Agreement"), pursuant to which Koons agreed to purchase from Lely two (2) defect-free Lely Astronaut A4 robots and other related milking equipment, which were designed, developed, manufactured, distributed and installed by Lely for the purpose of milking cows, for the sum of approximately $371,777.00.

215.   At the behest of Lely, the Koons incurred substantial costs to design and construct an addition to their existing barn that was specifically and necessarily designed to accommodate

and facilitate the use of the Lely Astronaut A4 based on blueprints, plans, specifications, suggestions and/or other recommendations provided by Lely, through its agents, servants, employees, and/or authorized dealers, including Kamps and Walton. Since the barn was specifically designed to be a voluntary milking facility, it was not optimized to be used to milk cows by any alternative method.

216.    The costs incurred by the Koons to design and construct the addition to their existing barn included, but were not limited to, costs for building, construction, design, architectural work, site work, electrical work, concrete work and other necessary work, which brought the total costs incurred by the Koons for the purchase and installation of the Lely Astronaut A4 robots and equipment to an amount well exceeding $600,000.00.

217.    The Koons became interested in the Lely Astronaut A4 in or about August of 2013, when they viewed the marketing materials discussed herein (or substantially similar versions). To induce the Koons to purchase the Lely Astronaut A4, Lely through its agents, servants, employees, and/or authorized dealers, including, but not limited to, Walton, arranged for them to visit eight (8) or more farms on which Lely Astronaut A4 robots were in operation from in or about September of 2013 to Spring of 2015, during which it aggressively marketed the purported benefits, features and past performance of the Lely Astronaut A4 by repeating the uniform representations specified herein.

218.    Not only did Lely employ high-pressure sales tactics during each of the dairy farm visits it organized and arranged, it also refused to allow the Koons to speak privately with the owners of those dairy farms to conceal the defects and operational problems with the Lely Astronaut A4 – which, as specified herein, were latent in nature and, thus, not readily apparent, obvious or visible during the few select visits to farms on which that milking system was in

operation – and further its deceptive, fraudulent and negligent marketing scheme, so that it could sell the Lely Astronaut A4 at an inflated price point far exceeding its actual value.

219.    Acting in reasonable reliance on the foregoing – as well as the representations detailing the past performance of Lely Astronaut A4 robots, and expressing their purported abilities, capabilities and performance in terms specific numbers or percentages (e.g., "10% more milk per year," "harvest[s] 5,000 pounds (2,268 kg) of milk per day," "achieve[s] 180 milkings per day," etc.) and the material facts concealed by Lely – the Koons, to their detriment, entered into the Koons Agreement and incurred substantial costs to purchase a Lely Astronaut A4 robot and to design and build an addition to their barn to house the Lely Astronaut A4.

220.    Once the addition to the barn was completed, the Lely Astronaut A4 robot was installed and incorporated into the new addition to the barn and, on or about April 25, 2018, the Koons began using the Lely Astronaut A4 robot.

221.    The Lely Astronaut A4 failed to work as represented, was defective, and had numerous, repeated operational problems and failures of which Lely had unique, peculiar and superior knowledge at or prior to the sale and delivery of the Lely Astronaut A4 to the Koons, including the defects and operational problems discussed in detail herein at paragraphs 114-147.

222.    The defects and problems with the Lely Astronaut A4 robot manifested in or about October of 2018, when the somatic cell count of the milk produced by the cows being milked by the robot began to steadily increase, reaching levels exceeding 700,000 cells/mL by August of 2019 – which exceeds the legal maximum of 500,000 cells/mL for Grade A milk in Virginia – due to the high incidence of mastitis caused by the defects with the Lely Astronaut A4 robot identified herein, including, but not limited to, the lack of adequate vacuum capacity and reserve.

223.    Moreover, due to the high somatic cell count of the milk being produced by the Koons, the cooperative to which the Koons supply their milk, the Cooperative Milk Producers Association ("CMPA"), began imposing a penalty on their milk product in January of 2019 when its somatic cell count reached and continued to exceed 450,000 cells/mL, a level that more than doubles the somatic cell count of the milk produced by the Koons before they began using the Lely Astronaut A4 and, instead, milked their cows in a conventional milking parlor.

224.    The high incidence of mastitis was also caused and exacerbated by the defective pre-stimulation – which, among other defects, failed to properly brush all four (4) teats of each cow approximately thirty-three percent (33%) of the time and, even when it brushed each teat, failed to remove a staggering ten to twenty percent (10-20%) of the bacteria present on the teats and udder – and the defective post-stimulation, which failed to accurately and adequately spray and cover teats with a disinfectant of the proper viscosity directly after milking.

225.    This was further exacerbated by failure of the MQC to detect cases of clinical and subclinical mastitis, or adequately and properly examine the quantity and quality of the milk received from the cows, and when necessary, separate milk that is contaminated or is not to the correct standard, all of which resulted in an end milk product that was contaminated by high somatic cell count levels, which prevented the Koons from being able to "supply only first class" or Grade A milk, as uniformly promised by Lely.

226.    As a result of the defects with the Lely Astronaut A4 specified herein, the Lely Astronaut A4 robot also failed to: provide production increases of ten to fifteen percent (10-15%) with labor productivity increases; milk sixty (60) cows 2.6 times a day; achieve one-hundred eighty (180) milkings or harvest five-thousand (5,000) pounds of milk a day; reduce feed or labor costs;

68

have an extra robot capacity of ten to fifteen percent (10-15%); disinfect the whole system after milking each cow; and eliminate bacteria or prevent cross-contamination.

227.    The foregoing, among other things, caused: damage to the cows owned by the Koons by damaging their teats, while also increasing their mastitis and culling rates; damage to the end milk product supplied by the Koons by increasing the somatic cell count thereof to levels exceeding 700,000 cells/mL, which exceeds the legal maximum for Grade A milk in Virginia and, thus, prevented the Koons from supplying only first-class milk; and decreased milk production, all of which resulted in thousands of dollars of property damage and lost profits.

228.    The foregoing also caused excessively high preliminary incubation counts in the milk produced by the Koons, because, among other defects specified herein, the Lely Astronaut A4 robot failed to thoroughly disinfect the "whole system" "after cleaning each cow" in direct contradiction to the uniform representations of Lely.  In addition, the Lely Astronaut A4 robots had drastically higher-than-represented box times, which adversely effected the capacity of each Lely Astronaut A4 robot, causing further financial harm to the Koons.

229.    As a result of the defects and operational problems with the Lely Astronaut A4 robots, each robot required more than the "maximum of four maintenance calls per year" uniformly represented by Lely, and the costs to service, maintain, repair and operate robot far exceeded the four thousand ($4,000) annual amount of those costs uniformly represented by Lely.  The annual energy costs incurred to operate the robots nearly doubled that incurred to operate their former milking parlor, depriving them of the "lowest cost of ownership" promised by Lely.

230.    The defects and problems with, and failures of, the Lely Astronaut A4 robots are the same defects, problems and failures of which Lely had peculiar, unique and superior knowledge from the T4C Data, the journal articles specified herein, expert consultations,

information from other dairy farmers, the firsthand observations of its authorized dealers, service technicians and other employees, and the other sources identified herein, all of which was concealed from the Koons and other dairy farmers.

231.    The defects, problems and failures experienced by the Koons are representative of the problems and failures of which Lely knew or should have known other dairy farmers had consistently and routinely experienced with the Lely Astronaut A4 from even before a single robot was sold up to, through and including the date on which Lely, through its agents, servants, employees and/or authorized dealers, induced the Koons to enter into the Koons Agreement, yet concealed from the Koons and other similarly situated dairy farmers with the intent to defraud them.

232.    The defects and problems with the robot were latent in nature, not disclosed by Lely to the Koons, not readily apparent, obvious or visible to the Koons before the robot was operational and incorporated into their barn, and could not have been discovered by the Koons upon reasonable diligence and inspection prior to the defects manifesting themselves in or about October of 2018 and thereafter, when the physical damage to their cows become observable and the quality of their milk product began to steadily decline.

233.    The defects, problems and failures of the Lely Astronaut A4 were not caused or contributed to by variation in farm animals, management practices or other conditions beyond the control of Lely or in the control of the Koons and, instead, were caused by the defects with the Lely Astronaut A4 created by Lely, over which it had control, of which it had peculiar, unique and superior knowledge at all times relevant herein, and all of which it concealed from the Koons with the intent to defraud them and other similarly situated dairy farmers.

234.    Lely did not offer to provide the Koons with any minimum adequate remedy to compensate them for their actual damages caused by, the Lely Astronaut A4 robots (within a reasonable time or otherwise), which were defective and failed to conform with the uniform advertisements, marketing and representations detailed herein, despite having knowledge of each defect and problem with the Lely Astronaut A4 robots purchased by the Koons, which were delivered, installed and repeatedly serviced by Lely.

235.    The Lely Astronaut A4 was less efficient, productive and profitable than the conventional milking system previously used to milk cows on the Koons Farm; caused the Koons to suffer significant property damage in that the health of the cows was negatively impacted, while numerous cows were lost due to culling and mastitis, thereby reducing their herd size and milk production capacity; and, overall, worsened caused financial turmoil for the Koons and worsened their quality of life.

236.    The Koons were also damaged in that they paid an artificially and fraudulently inflated purchase price for the Lely Astronaut A4 robot, which inappropriately reflected the false information uniformly represented by Lely to the Koons, other dairy farmers in the United States, and the general public. This caused the purchase price of the Lely Astronaut A4 to be inflated beyond its value, meaning every purchaser, including the Koons, was injured by paying too much when, had the truth been known, they would have paid a lower price or not purchased at all.

## EXPRESS WARRANTY

237.    To advertise, market and sell the Lely Astronaut A4 to dairy farmers, including Kirschbaum, Kruger, Koons and members of the Class, Lely made specific guarantees, promises and representations, including without limitation those set forth above in paragraphs 114-147, all

of which were affirmations of fact or promises made by Lely relating to the Lely Astronaut A4 and, thus, became part of the basis of the bargain and constitute express warranties.

238.     Kirschbaum, Kruger, Koons and members of the Class would not have purchased the Lely Astronaut A4 and/or replaced their existing milking systems with the Lely Astronaut A4 had they known that the Lely Astronaut A4 did not conform to the express warranties described above. In fact, it would have been illogical and implausible for them to expend significant sums of money to purchase the Lely Astronaut A4, unless it conformed to those express warranties.

239.     The express warranties to which the Lely Astronaut A4 did not conform caused the purchase price of the Lely Astronaut A4 to be fraudulently-inflated, as a result of which Kirschbaum, Kruger, Koons and members of the Class were necessarily injured because the deceptive, fraudulent and negligent marketing scheme pushed by Lely caused the purchase price of the Lely Astronaut A4 to be inflated beyond its value, meaning every purchaser paid too much.

240.     Lely knew that the Lely Astronaut A4 did not conform to the express warranties set forth herein based on, among other things, the onboard monitoring system, the T4C Data, the Journal of Dairy Science Articles, the Acta Argiculturae Scandinavica Journal Article, expert consultations informing Lely that the vacuum capacity and reserve were inadequate and failed every industry-recognized test, the firsthand observations of its authorized dealers, service technicians and other employees, and the numerous complaints made by Kirschbaum, Kruger, Koons and members of the Class regarding the system, as well as other customers worldwide.

241.     At the time of sale, Lely knew that the Lely Astronaut A4 robots and equipment were defective in the manner described herein, and that they did not perform as uniformly represented or even to a minimal degree of merchantability. Indeed, dairy farmers like Plaintiffs,

who transitioned to Lely Astronaut A4 robots, saw productivity decrease and costs increase, which is the opposite of any reason to purchase Lely Astronaut A4 robots.

242.    In sum, Lely induced Plaintiffs to purchase Lely Astronaut A4 robots by falsely advertising, concealing, misrepresenting, and negligently stating material facts and information about the ability, benefits and capability of the Lely Astronaut A4 to, among other things, increase milk efficiency, production and quality, ensure only Grade A milk was produced, improve quality of life, and decrease feed, maintenance, operational, service, labor and other costs, as well as its then-existing intention to provide maintenance, service and support.

## LELY NEVER PROVIDED ANY MINIMUM ADEQUATE REMEDY SUFFICIENT TO COMPENSATE PLAINTIFFS FOR THEIR ACTUAL DAMAGES CAUSED BY THE LELY ASTRONAUT A4

243.    Lely failed to repair, provide an adequate replacement for, or refund the purchase price of the defective Lely Astronaut A4 robots (within a reasonable time or otherwise), which were defective and failed to conform with either the express or implied warranties discussed herein, despite having knowledge, and receiving adequate notice, of each defect and problem with the Lely Astronaut A4 robots in a timely manner.

244.    The failure of Lely to correct the defective condition of the Lely Astronaut A4 robots purchased by Plaintiffs resulted in repeated operational problems and failures therewith, which continued to persist until Plaintiffs were forced to take the Lely Astronaut A4 robots out of operation, system downtime during which cows could not be milked, increased labor costs, decreased milk production, lost business and lost profits.

245.    Lely has failed to provide any minimum adequate remedy sufficient to compensate Plaintiffs for their actual damages caused by the Lely Astronaut A4 – including, but not limited to, the purchase, installation and service costs of the Lely Astronaut A4, feed, maintenance,

operational, service, labor and other costs, value of the cows lost to culling and mastitis, and lost business and profits.

246.     Lely knew that by failing to provide a minimum adequate remedy sufficient to compensate Plaintiffs for their actual damages caused by the Lely Astronaut A4, it was depriving them or other similarly situated dairy farmers of the benefits of their bargain by subjecting them to financial hardship and/or ruin, with numerous purchasers, being forced to sell their dairy farms and/or file for bankruptcy, which would not occur if an adequate remedy had been provided.

247.     Plaintiffs sustained consequential and incidental damages that would not have been sustained but for Lely designing, marketing and selling defective Lely Astronaut A4 robots, were not within the contemplation of Plaintiffs or Lely at the time Plaintiffs purchased their respective Lely Astronaut A4 robots and, thus, Plaintiffs are entitled to recover all of their damages from Lely without limitation, including, but not limited to, consequential and incidental damages.

## CLASS ACTION ALLEGATIONS

248.     <u>Class Definition</u>: Plaintiffs bring this action on behalf of themselves and other similarly situated individuals. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek certification of Nationwide Class (the "Nationwide Class") and the following Subclasses defined as follows:

> All Persons in the United States or its territories who purchased, financed, leased, and/or rented a Lely Astronaut A4 robot (the "Nationwide Class").

> All Persons who are residents of Minnesota and who purchased, financed, leased, and/or rented a Lely Astronaut A4 robot (the "Minnesota Subclass").

> All Persons who are residents of Virginia and who purchased, financed, leased, and/or rented a Lely Astronaut A4 robot (the "Virginia Subclass").

> All Persons who are residents of Wisconsin and who purchased, financed, leased, and/or rented a Lely Astronaut A4 robot (the "Wisconsin Subclass").

249. Excluded from the Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, and agents; and governmental entities.

250. Numerosity: the Class consists of members so numerous and geographically dispersed that joinder of all members is impracticable, as Plaintiffs believe there are several hundred members in the Class spread across several states.

251. Common Questions of Law and Fact Predominate: There are many questions of law and fact common to Plaintiffs and Class members, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact including:

    a. Are the Lely Astronaut A4 robots defectively designed?

    b. Do the Lely Astronaut A4 robots have defects in material and workmanship?

    c. Were Defendants on notice of the defective nature of the Lely Astronaut A4 robots and, if so, as of what date?

    d. Do the Lely Astronaut A4 robots meet the past performance data and statistics uniformly represented by Defendants?

    e. Did Defendants breach an express and/or implied warranty of merchantability?

    f. Were the Lely Astronaut A4 robots merchantable at the time of sale?

    g. Did Defendants breach an implied warranty of fitness for a particular purpose?

    h. Did Defendants owe a duty of care to Plaintiffs and the Class?

    i. Were Defendants negligent?

    j. Did Defendants make material misrepresentations in advertising, marketing and selling the Lely Astronaut A4?

    k. Did Defendants conceal facts regarding the Lely Astronaut A4 robots?

    l. Did Defendants breach their contracts with Plaintiffs and the Class?

m. Were Plaintiffs and the Class damaged by Defendants' actions?

252.    All members of the Class are ascertainable by reference to objective criteria. Lely has access to addresses and other contact information for Class members which can be used for notice purposes.

253.    <u>Typicality</u>: Plaintiffs claims are typical of other members of the Class because all of the claims arise from the same course of conduct by Lely, the same defects and operational problems with the Lely Astronaut A4 and are based on the same legal theories.

254.    <u>Adequacy of Representation</u>: Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the Class members whom they seek to represent. Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of class members and have the financial resources to do so. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

255.    <u>Superiority of Class Action</u>: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

256.    To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into subclasses if necessary.

## TOLLING

257.    Any applicable statute of limitations that might otherwise bar any claim of any Plaintiff or member of the Class has been tolled by Defendants' knowing and active concealment of the facts alleged above.  Plaintiffs and the Class were ignorant, by no fault of their own or due to any failure by them to exercise due diligence, of vital information essential to the pursuit of their claims and of which Defendants had superior, unique and particular knowledge.

258.    Plaintiffs and the Class could not reasonably have discovered and filed suit regarding their claims, because Defendants misled them into believing that the Lely Astronaut A4 was free of defects, performed as uniformly represented, that "[its other] customers excel in sustainable milk production," and that any problems were of their own making, all the while Defendants had exclusive possession and superior, unique and particular knowledge of material facts to the contrary to which Plaintiffs and the Class did not have access.

259.    Moreover, the defects and problems with the Lely Astronaut A4 were latent in nature, take several months or more to manifest and, thus, Plaintiffs and other members of the Class could not have been aware of them prior to them being manifested.  For example, as set forth in detail above, the problems stemming from the inadequate vacuum capacity and reserve, among others, damaged and increased the infection rates of cows over the long term with damage to, and infection rates of, cows increasing over time.

260.    The defects and problems with the Lely Astronaut A4 robot purchased by Kruger did not manifest until after it had been in operation for approximately four or more months, at which time the somatic cell count of the milk produced by the cows being milked by the robot began to steadily increase and the damage to his cows became observable.  The same is true of the

defects and problems with the Lely Astronaut A4 robots purchased by the Koons, which manifested only after they had been in operation for approximately eight months.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

261.    Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

262.    Lely agreed to provide Plaintiff with Lely Astronaut A4 robots that were free from defects and, pursuant to the uniform advertisements, marketing and representations detailed herein, performed and, in fact, had performed in the past on other dairy farms in a manner consistent with the substance of those uniform advertisements, marketing and representations. Plaintiffs and the Class paid substantial consideration in exchange for the foregoing promises made by Lely.

263.    Lely breached its contractual obligations and promises by furnishing Lely Astronaut A4 robots that, without exception, had numerous defects in design, material and workmanship, including, but not limited to those detailed herein at paragraphs 114-147, and were plagued by numerous, repeated operational problems that are and were uniformly experienced by purchasers of Lely Astronaut A4 robots.

264.    These defects and operational problems were incapable of being corrected, cured or otherwise remedied, and prevented the Lely Astronaut A4 from functioning, operating and performing as uniformly advertised, marketed and represented by Lely. At all times relevant herein, Lely knew that it was delivering Lely Astronaut A4 robots that had the defects in design, material and workmanship, and suffered from the operational problems, detailed herein.

265.    The aforementioned defects and operational problems with the Lely Astronaut A4 are latent defects of which Plaintiffs and the Class were unaware prior to them being manifested, which were not disclosed to Plaintiffs or the Class by Lely, were not readily apparent, obvious or visible to Plaintiff or the Class before the Lely Astronaut A4 became operational, and could not have been discovered by Plaintiff or the Class upon reasonable diligence and inspection.

266.    The aforementioned defects and operational problems with the Lely Astronaut A4 were not caused or contributed to by variation in farm animals, management practices or other conditions beyond the control of Lely or in the control of Plaintiffs or the Class and, instead, were caused by the defects with the Lely Astronaut A4 created by Lely, over which it had control and of which it had peculiar, unique and superior knowledge.

267.    Lely systematically breached its contractual obligations and promises by failing to provide Plaintiffs and the Class with Lely Astronaut A4 robots and equipment that were free from defects in design, material and workmanship, as well as operational problems, and conformed to the uniform advertisements, marketing and representations detailed herein, despite full contractual performance by Plaintiffs and the Class.

268.    The Lely Astronaut A4 robots furnished by Lely, through its agents, servants and/or employees, were defective and did not conform to the uniform advertisements, marketing and representations detailed herein in that, among other defects, problems and failures detailed herein, they failed to work properly, were defective and faulty, and had numerous, repeated operational problems of which Lely had peculiar, unique and specialized knowledge.

269.    Lely was duty-bound to abide by an implied covenant of good faith and fair dealing, which, among other things, serves to prevent one party from unfairly taking advantage of the other party, evading the spirit of the transaction, and denying the other party the expected benefit of the

contract. This implied covenant of good faith and fair dealing also emphasizes faithfulness to an agreed common purpose and consistency for the justified expectations of the other party. As a result of the aforementioned conduct, Lely not only breached its contractual obligations and promises, but also breached the implied covenant of good faith and fair dealing.

270.    By reason of the foregoing, Plaintiffs and the Class have been damaged and seek all remedies in the aggregate or in the alternative, including revocation of the contract and return of the purchase price and consequential damages and losses, including, but not limited to, the costs incurred in installing the equipment and building or remodeling their barns, increased labor costs, lost business profits, and all other damages permitted by law.

## SECOND CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

271.    Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

272.    A warranty that the Lely Astronaut A4 shall be merchantable was implied in its sale because Lely is a merchant who deals in goods of that kind and hold itself out as having knowledge and skill peculiar to the robotic and/or voluntary milking industry by advertising, marketing and representing themselves to be an "international" business in the agricultural sector, which provides advice "on how to organize a dairy farm smartly with the use of management systems[,]" and claims that "[d]airy farming is something [it] live[s] to do."

273.    The Lely Astronaut A4 robots purchased by Plaintiffs do not pass without objection in the dairy farming trade under the description conveyed in the uniform marketing scheme carried out by Lely and are not fit for the ordinary purpose for which such devices are used in that the Lely

Astronaut A4, when used in the customary, usual and reasonably foreseeable manners, was defective, failed to milk cows and suffered from other serious operational deficiencies and errors, which are alleged herein and incorporated by reference.

274. The Lely Astronaut A4 robots purchased by Plaintiffs do not run of even kind, quality and quantity within each unit and among all units involved, and do not conform to the promises and/or affirmations of fact made on the container, label and/or accompanying catalogues, manuals and/or brochures, including, but not limited to, the promises and/or affirmations of fact made in the Lely Astronaut A4 Brochure, the Lely Dairy Equipment Brochure, the E-Manual, the Farm Management Manual and elsewhere.

275. By reason of the foregoing, Lely breached the implied warranty of merchantability and Plaintiffs and the Class are entitled to recover all of their damages from Lely.

### THIRD CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF FITNESS
### FOR A PARTICULAR PURPOSE

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

276. Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

277. Plaintiffs and the Class specified to Lely, through its agents, servants and/or employees, that they required Lely Astronaut A4 robots capable of, among other things: milking at least sixty cows per robot 2.6 times a day or more; increasing their milk production; achieving one-hundred eighty (180) milkings a day or more; harvesting at least five thousand (5,000) pounds of milk a day; offers lower feed, ownership, operation, maintenance, service and labor costs than traditional parlor milking systems; offers more effective cleaning, pre-stimulation and post-

stimulation that traditional parlor milking systems; thoroughly disinfects the whole system after each cow is milked to eliminate bacteria and prevent cross-contamination; consistently and reliably attaching teat cups to each teat and ensuring that there are no missed quarters; and increasing the quality of the milk produced by lowering the somatic cell count, lab pasteurized count, standard plate count and raw bacteria.

278.   Plaintiffs and the Class relied on the skill and judgment of Lely, who holds itself as experts "on how to organize a dairy farm smartly with the use of management systems," to select and furnish a suitable voluntary or other milking system capable of meeting or exceeding their aforementioned requirements, a fact that was conveyed by Plaintiffs and the Class to Lely, through their agents, servants and/or employees.

279.   Plaintiffs and the Class relied on the skill and judgment of Lely in purchasing Lely Astronaut A4 robots, which were not fit for the particular purpose for which they were required in that, among other things detailed herein, it failed to: milk at least sixty cows per robot 2.6 times a day or more; increase their milk production; achieve one-hundred eighty (180) milkings a day or more; harvest at least five thousand (5,000) pounds of milk a day; offer lower feed, ownership, operation, maintenance, service and labor costs than traditional parlor milking systems; offer more effective cleaning, pre-stimulation and post-stimulation that traditional parlor milking systems; thoroughly disinfect the whole system after each cow is milked to eliminate bacteria and prevent cross-contamination; consistently and reliably attach teat cups to each teat and ensure that there are no missed quarters; and increase the quality of the milk produced by lowering the somatic cell count, lab pasteurized count, standard plate count and raw bacteria.

280.    By reason of the foregoing, Lely breached the implied warranty of fitness for a particular purpose and Plaintiffs and the Class are entitled to recover all of their damages from Lely.

## FOURTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

281.    Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

282.    Lely expressly warrantied that the Lely Astronaut A4 robots and equipment would, at the time of sale and thereafter, perform as represented, conform to the specific guarantees, promises and representations, including without limitation those set forth above in paragraphs 69-90, and be free of the defects and operational problems identified in paragraphs 114-147 above.

283.    The Lely Astronaut A4 was defective and failed to live up or conform to even the most basic affirmations of fact, promises, representations and descriptions made by Lely, as to the abilities, benefits, capabilities and past performance of the Lely Astronaut A4, all of which are alleged in detail herein, specifically incorporated by reference and formed part of the basis of the bargain to which the sale of the Lely Astronaut A4 relates.

284.    The purchase price of the Lely Astronaut A4 also formed part of the basis for the bargain in that it reflected the aforementioned affirmations of fact, promises, representations and descriptions made by Lely – the falsity of which caused the purchase price to be fraudulently-inflated far beyond its actual value – and, thus, each Plaintiff and other purchaser ipso facto relied on those affirmations of fact, promises, representations and descriptions, because, had the truth been known, they would have paid a lower price or not purchased at all.

285.     At all times relevant herein, Lely knew of material facts establishing, indicating and/or providing that the Lely Astronaut A4 was defective, that the dairy farms on which it had been and was operational experienced numerous problems as a result of its defects, which were incapable of being corrected or cured, and were conveyed to Lely before the express warranties were made and Plaintiffs and the Class purchased their respective Lely Astronaut A4 robots, including, but not limited to, those identified above in paragraphs 114-147.

286.     The natural tendency of the express warranties was to induce Plaintiffs and the Class to purchase the Lely Astronaut A4 and, in reasonable reliance on the foregoing, Plaintiffs and the Class purchased Lely Astronaut A4 robots from Lely, which, to their detriment, were defective and failed to live up or conform to even the most basic of the affirmations of fact, promises, representations and descriptions made by Lely.

287.     By reason of the foregoing, Lely breached the express warranty created by the aforementioned affirmations of fact, promises, representations and descriptions, entitling Plaintiffs and the Class to recover all of their damages from Lely.

## FIFTH CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

288.     Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

289.     Lely failed to properly design and manufacture the Lely Astronaut A4, which it placed on the market despite knowing that, as designed, it posed a substantial likelihood of harm to dairy farmers and their property in that it decreases the quality and value of their milk by increasing somatic cell count, lab pasteurized count, standard plate count and raw bacteria,

decreases their milk production, increases mastitis and culling rates of their herds, physically damages cows, and causes other damages as alleged herein.

290.    At all times relevant herein, Lely knew that the Lely Astronaut A4 was defectively designed and manufactured, and that the dairy farms on which it had been and was operational experienced numerous problems as a result of its defects, which were incapable of being corrected or cured, and were conveyed to Lely before the aforementioned express warranties were made and Plaintiffs and the Class purchased their respective Lely Astronaut A4 robots, including, but not limited to, those identified herein at paragraphs 114-147.

291.    The aforementioned defects with the Lely Astronaut A4, among other defects of which Lely had peculiar, unique and specialized knowledge at all times relevant herein, including at and before each of the aforementioned representations were made, caused the problems with and failures of the Lely Astronaut A4 robots experienced by Plaintiffs and the Class, including, but not limited to, those identified herein at paragraphs 114-147.

292.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by designing and programming it to: completely brush all four (4) teats of each cow during pre-stimulation, be able to discriminate between a dirty and clean udder, completely dry each teat before any of the teat cups are attached and the milking process commences, and not attach any of the teat cups unless and until one-hundred percent (100%) of the bacteria present on the teats and udder is removed.

293.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by designing it to prevent cows from being milked unless and until all quarters are attached and/or equipping it with a mechanism or safeguard to prevent cows from being milked unless and until all quarters are attached, as well as by correcting, curing and/or eliminating the

camera, design, encoder, programming and other defects, which caused the aforementioned teat attachment issues and resulted in missed quarters, and/or using a camera that was suitable for the environment in which it was intended to be used, specifically a dairy farm.

294.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by: equipping it was a more powerful vacuum pump that meets the minimum capacity and reserve requirements of the NMC discussed above in paragraphs 114-147; having a separate vacuum pump for each robot with only one vacuum regulator located near the milking units, as opposed to having two robots share one vacuum pump controlled by three separate vacuum regulators, all of which is located in a central unit up to thirty (30) meters away; using a larger, smoother vacuum supply tube, as opposed to a corrugated one, to reduce the friction of moving air through the vacuum supply tube; having a separate motor to operate the milk pump bladder; designing the milk tubes to transport milk by gravity, as opposed to unnecessarily expending energy to overcome gravity when lifting milk from the robot arm, through the milk tubes, and vertically upwards into the milk measurement system; and reducing the distance – and, thus, the frication caused by air moving – between the vacuum pump and the teat cups.

295.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by using more durable liners of a material that does not prematurely and without warning develop cracks, openings, penetrations and tears, and which are adapted to fit the average teat size of herds in the United Sates and of purchasers of Lely Astronaut A4 robots.

296.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by equipping it with a milk quality control device or feature that gives notice of clinical mastitis, abnormal milk, or subclinical mastitis, which despite the representations of Lely

to the contrary, the Lely Astronaut A4 did not have or, in the alternative, did have, but was defective and failed to function, operate and/or work as designed and represented.

297.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by programming it not to overmilk cows by ensuring that there is still an easily obtainable stream of milk remaining in each quarter after the milking process has been completed and the teats cups have been removed, as opposed to permitting the robot to continue to attempt to milk the teats of the cow even though milk is no longer being secreted from the udder for periods of time up to and/or exceeding forty-five (45) seconds.

298.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by programming it to: accurately and adequately spray and cover teats with a disinfectant of the proper viscosity directly after milking; account for the decreased diameter of teats after they have been milked; repeat the process of detecting the location of each teat after milking, but before attempting to spray and cover the teats with disinfectant, so the decreased teat size may be accounted for and the location of the teats may accurately be determined.

299.    It was feasible for Lely to design the Lely Astronaut A4 in a better, safer and more effective manner by eliminating the silicone milk pump bladder and, instead, using the alternative milk pump system to transport milk from the milk jar to the milk tank, which the Lely Astronaut A3 used to transport milk and, due to the defects and problems with the silicone milk pump bladder of the Lely Astronaut A4 discussed in detail herein, was reincorporated by Lely into the Lely Astronaut A5 to the correct the defects with the milk pump bladder of the Lely Astronaut A4.

300.    The aforementioned defects caused significant damage to Plaintiffs' and Class members' property. The defects with the Lely Astronaut A4 caused damage to the cows owned by Plaintiffs and the Class in that it caused damage to their teats, and caused their mastitis and

infection rates to increase, all of which resulted in injury and death to cows, due to, among other things, the failure to: properly clean their teats and udder during pre-stimulation; properly and fully milk each quarter of every cow during every milking in a sanitary manner; maintain vacuum stability during milking to prevent impacts; provide appropriate liners adapted to the average teat size of the herd; and perform appropriate post-stimulation by spraying and covering each teat with a disinfectant of the proper viscosity directly after milking.

301.    As a result, many cows owned by Plaintiffs and the Class either had to be culled or died due to the severity of their infections, thereby depriving Plaintiffs and the Class of the value of those cows, while others had to have one or more entire quarters removed, which permanently reduced the milk producing capacity of those cows by approximately twenty-five percent (25%) per quarter that had to be removed, causing the value of those cows to decrease significantly.

302.    The aforementioned defects with the Lely Astronaut A4 also damaged the quality of the milk produced by the cows owned by Plaintiffs and the Class by causing its somatic cell count, raw bacteria, standard plate count and laboratory pasteurization count to significantly increase.  Moreover, the Lely Astronaut A4 caused the cows owned by Plaintiffs and the Class to produce less milk than previously, while causing significant damage to their teats over time to the point where they could not be milked or produce milk at all, which decreased their value.

303.    Further, the defects also caused damage to Plaintiffs' and Class members barns and farms including, but not limited to, causing Plaintiffs and Class members to destroy or retrofit barns that were then only fit to use the Lely Astronaut A4 after which Plaintiffs' and Class members' had to rebuild barns or repair the damage to their respective dairy farms and barns caused by the installation of the defective Lely Astronaut A4.

304. The egregious conduct of Lely – which caused the damages sustained by Plaintiffs and the Class and was part of a pattern of similar conduct aimed and directed not only at Plaintiffs and the Class, but at the public generally – amounts to such gross, wanton and willful fraud, dishonesty and malicious wrongdoing as to involve a high degree of moral culpability and turpitude, which demonstrates such wanton fraud, dishonesty and malicious wrongdoing as to imply a criminal indifference to civil obligations.

305. By reason of the foregoing, Plaintiffs and the Class are entitled to recover all of their damages from Lely, including, but not limited to, punitive damages.

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

306. Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

307. Due to its unique, peculiar and superior knowledge of the defects and problems with the Lely Astronaut A4, it was foreseeable, if not foreseen, by Lely that if its product did not perform as represented, Plaintiffs and the Class would suffer personal injury, economic loss and property damage. Plaintiffs and the Class designed and either constructed an entirely new barn or retrofitted an existing barn to accommodate the use of the Lely Astronaut A4 at the behest of Lely; the Lely Astronaut A4 damage the herds of Plaintiffs and the Class in the form of teat damage, mastitis, and bacterial infections; the Lely Astronaut A4 caused damage to the end milk product produced by Plaintiffs and the Class by dramatically increasing bacteria counts. These injuries, and the way they occurred, were entirely foreseeable, and even foreseen, by Lely before it delivered the Lely Astronaut A4 robots to Plaintiffs and the Class, even though such injuries were

not foreseeable to Plaintiffs and the Class.  Consequently, Lely owed a duty of care to prevent said injuries.

308.     Lely, by its agents, servants and/or employees, was reckless, careless and negligent in failing to properly design the Lely Astronaut A4, which it placed on the market despite knowing that the Lely Astronaut A4, as designed, posed a substantial likelihood of harm and that it was feasible to design the Lely Astronaut A4 in a safer manner; in designing, developing, manufacturing, advertising, selling, promoting, servicing, maintaining, installing, repairing and distributing the Lely Astronaut A4; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that failed to milk cows; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that decreased milk efficiency, production, quality and/or value; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that increased somatic cell count, standard plate count and raw bacteria; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that was not capable of and/or failed to milk at least sixty cows an average of 2.6 times a day; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that was not capable of and/or failed to increase milk production by ten percent or otherwise; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that increased feed, labor, energy consumption and operational costs; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that had repeated operational failures, including, but not limited to, sensor issues, improper and inadequate attachments, slower and less dependable teat attachment rates, increased teat cleaning time, and the failure to milk cows; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that increased mastitis rates of the herd on the Dairy Farms and failed to give

notice of potential mastitis, which resulted in cows being treated at a later stage, longer recovery times for cows, death of cows, increased culling, less milk production, lost business and lower profits than before the dairy farms began using the Lely Astronaut A4; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that had numerous, repeated cup attachment failures; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that decreased the health of cows and killed cows; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 with a robotic arm that fails to adequately and properly perform teat sanitation; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that decreases milk flow; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 with excessively long unit on time; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that increases cleaning time; in designing, developing, manufacturing, selling, providing and installing a Lely Astronaut A4 that fails to adequately and properly clean and/or sanitize; in failing to provide support, service, maintenance, repairs and/or other assistance; in abandoning Plaintiffs and the Class despite assurances and promises of support; in failing to adequately, properly and timely service, maintain, repair and/or replace the Lely Astronaut A4 and/or its components and parts; in misrepresenting the abilities, capabilities and ease of use of the Lely Astronaut A4; in failing to warn; in decreasing milk efficiency, production, quality and value; in increasing labor and energy consumption costs; in failing to provide skill and judgment in furnishing and selecting the Lely Astronaut A4; in failing to make proper recommendations; in failing to exercise the standard of care and skill required of a provider of milking equipment; in failing to have adequate, sufficient and properly trained employees, personnel, staff and salesmen; in failing to provide a milking system that worked as necessary, promised, warrantied, and agreed;

in falsely representing and promising that the Lely Astronaut A4 had a Milk Quality Control feature capable of accurately identifying cases of mastitis; in inducing Plaintiffs and the Class to purchase the Lely Astronaut A4; in causing Plaintiffs and the Class to lose business and profits; in failing to provide a Lely Astronaut A4 that worked, was fit for its intended purpose, and/or operated as represented and advertised; in creating a trap, hazard and/or nuisance; in launching a force and/or instrument of harm; in failing to exercise reasonable, necessary, proper and adequate care; in violating applicable laws, rules and regulations; and Lely was otherwise reckless, careless and negligent.

309. The egregious conduct of Lely – which caused the damages sustained by Plaintiffs and the Class and was part of a pattern of similar conduct aimed and directed not only at Plaintiffs and the Class, but at the public generally – amounts to such gross, wanton and willful fraud, dishonesty and malicious wrongdoing as to involve a high degree of moral culpability and turpitude, which demonstrates such wanton fraud, dishonesty and malicious wrongdoing as to imply a criminal indifference to civil obligations.

310. As a result of Lely's breach of its duty to act with reasonable care, Plaintiffs and the Class suffered economic injuries, as well as property injuries to their herds in the form of increased mastitis, death and decreased herd size and to their barns which were retrofitted or re-built solely for use of the defective Lely Astronaut A4 robots. They also suffered property injuries to their milk in the form of increased bacteria counts and lower milk quality.

311. By reason of the foregoing, Plaintiffs and the Class are entitled to recover all of their damages from Lely, including, but not limited to, punitive damages.

## SEVENTH CAUSE OF ACTION

### FRAUDULENT CONCEALMENT

*On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

312.    Plaintiffs and the Class hereby repeated, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

313.    Lely had unique, peculiar and superior knowledge of the defects and problems with the Lely Astronaut A4, as well as material facts contradicting the representations it made to Plaintiffs and the Class, from, among other non-public sources, the T4C Data, its own internal data and studies, and the experiences relayed to it by other dairy farmers, all of which Lely had a duty to disclose, yet concealed with the intent to defraud Plaintiffs and the Class thereby.

314.    Lely had a duty to disclose the aforementioned defects, problems and material facts concerning the Lely Astronaut A4, because, among other reasons specified herein, it had peculiar, unique and superior knowledge of such defects, problems and materials facts, which was not available to Plaintiffs and the Class and could not have been discovered by Plaintiffs and the Class with the exercise of reasonable diligence.

315.    Lely also had a duty to disclose the aforementioned defects, problems and material facts, because it made representations to Plaintiffs and the Class – both voluntarily and in response to direct inquires – that were deceptive, false, misleading and, at best, half-truths, which required additional disclosure, specifically of the aforementioned defects, problems and material facts, to avoid misleading Plaintiffs and the Class.

316.    Lely intended to defraud Plaintiffs and the Class by concealing and failing to disclose the aforementioned defects, problems and material facts, each of which it had unique, peculiar and superior knowledge. The concealed and undisclosed defects, problems and material

facts were material, unknown by Plaintiffs and the Class, and could not have been discovered or known by Plaintiffs and the Class with the exercise of reasonable diligence.

317.    Had the aforementioned defects, problems and material facts been disclosed to Plaintiffs and the Class and not concealed by Lely with the intent to defraud them, no Plaintiff or member of the Class would have purchased a Lely Astronaut A4 robot. As a result of the foregoing, Plaintiffs and the Class sustained not only economic damages, but also damage to their property, including their cows and milk products, as alleged in detail herein.

318.    By reason of the foregoing, Plaintiffs and the Class have sustained damages, including, but not limited to, having purchased and made expenditures to install the Lely Astronaut A4 robots that failed to perform as uniformly represented, lost profits, and increased operational and labor costs, as well as substantial damage to their property, including, but not limited to, damage to and loss of cows, damage to their milk in form of increased bacteria counts rendering said milk less valuable or unusable, and damage to their farms.

## EIGHTH CAUSE OF ACTION

### VIOLATION OF MINN. STAT. § 325F.67
### (False Statement in Advertising Act enforced through Minn. Stat. § 8.31)

*On Behalf of Plaintiff Jared Kruger and the Minnesota Subclass*

319.    Plaintiff Jared Kruger ("Plaintiff," for purposes of this Count), individually and on behalf of the Minnesota Subclass, and hereby repeats, reiterates and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

320.    Lely is a "person, firm, corporation, or association" as defined by Minn. Stat. § 325F.67.

321.    Plaintiff is a member of "the public" as defined by Minn. Stat. § 325F.67.

322.     As described herein, with the intent to sell or dispose of merchandise, services, or anything else offered by Lely (directly or indirectly) to the public for sale or distribution, and/or with the intent to induce the public in any manner to enter into any obligation relating thereto, or to acquire any interest therein, Lely made, published, disseminated, circulated and placed before the public, or caused (directly or indirectly) to be made, published, disseminated, circulated, or placed before the public in Minnesota advertisements, announcements, statements, and representations regarding the Lely Astronaut A4, which, as set detailed herein, were untrue, deceptive, and/or misleading in violation of Minn. Stat. § 325F.67.

323.     As a direct and proximate result of Lely's deceptive acts or practices, Plaintiff has suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

324.     Plaintiff seeks all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Minn. Stat. § 325F.67 and Minn. Stat. § 8.31, and punitive damages.

## NINTH CAUSE OF ACTION

### VIOLATION OF MINN. STAT. §§ 325F.68, 325F.69, 325F.70
### (Prevention of Consumer Fraud Act enforced through Minn. Stat. § 8.31)

*On Behalf of Plaintiff Jared Kruger and the Minnesota Subclass*

325.     Plaintiff Jared Kruger ("Plaintiff," for purposes of this Count), individually and on behalf of the Minnesota Subclass, and hereby repeats, reiterates and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

326.     Lely is a "person" as defined by Minn. Stat. § 325F.68.

327.     The Lely Astronaut A4 is "merchandise" as defined by Minn. Stat. § 325F.68.

328.    As described herein, Lely acted, used and/or employed fraud, false pretense, false promise, misrepresentations, misleading statements and/or deceptive practices with the intent that others, including Plaintiff, rely thereon in connection with the sale of merchandise, including the Lely Astronaut A4 that it sold to Plaintiff in violation of Minn. Stat. § 325F.69.

329.    Defendants' misrepresentations and deceptive practices adversely affected dairy farmers in Minnesota and, consequentially, the general public for whom the dairy farmers produce milk by, among other things, decreasing the quality of the milk available to them, resulting in members of the general public consuming milk with higher bacteria, somatic cell and lab pasteurization levels.

330.    As a direct and proximate result of Lely's unlawful practices, Plaintiff has suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

331.    Plaintiff seeks all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Minn. Stat. §§ 325F.68, 325F.69 and Minn. Stat. § 8.31, and punitive damages.

### TENTH CAUSE OF ACTION

**VIOLATION OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. § 325D.43 *ET SEQ.***

*On Behalf of Plaintiff Jared Kruger and the Minnesota Subclass*

332.    Plaintiff Jared Kruger ("Plaintiff," for purposes of this Count), individually and on behalf of the Minnesota Subclass, and hereby repeats, reiterates and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

333.    Lely is a "person" as defined by Minn. Stat. § 325D.43 *et seq.*

334.    Lely engaged in deceptive trade practices in the course of its business, vocation and/or occupation in violation of Minn. Stat. § 325D.44.

335.    As detailed herein, Lely violated Minn. Stat. § 325D.44, by among other violations set forth in detail herein, falsely representing that goods or services are of a particular standard, quality, or grade, when they are of another, as well as by engaging in conduct which similarly creates likelihood of confusion or misunderstanding.

336.    As a direct and proximate result of Lely's deceptive trade practices, Plaintiff has suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

337.    Plaintiff seeks all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under the Minnesota Deceptive Trade Practices Act, and punitive damages.

### ELEVENTH CAUSE OF ACTION

### VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT, WIS. STAT. § 100.18 *ET SEQ.*

*On Behalf of Plaintiff Lynn Kirschbaum and the Wisconsin Subclass*

338.    Plaintiff Kirschbaum ("Plaintiff" for purposes of this Count), individually and on behalf of the Wisconsin Subclass, hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

339.    Lely is a "person, firm, corporation or association" as defined by Wis. Stat. § 100.18(1).

340.    Plaintiff is a member of "the public" as defined by Wis. Stat. § 100.18(1).

341.    As described herein, with the intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by Lely to members of the public for sale, use, or

distribution, Lely made, published, circulated, placed before the public or caused (directly or indirectly) to be made, published, circulated, or placed before the public in Wisconsin advertisements, announcements, statements, and representations to the public which contained assertions, representations, or statements of fact which are untrue, deceptive, and/or misleading, in violation of Wis. Stat. § 100.18(1).

342.     As a direct and proximate result of Lely's deceptive acts or practices, Plaintiff has suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

343.     Plaintiff seeks all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Wis. Stat. § 100.18(11)(b)(2), and punitive damages.

## TWELFTH CAUSE OF ACTION

### VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT, VA. CODE ANN. § 59.1-196 *ET SEQ.*

*On Behalf of Plaintiffs Donna and Robert Koon and the Wisconsin Subclass*

344.     Plaintiffs Koons ("Plaintiffs" for purposes of this Count), individually and on behalf of the Virginia Subclass, hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

345.     Lely is a "supplier" as defined by VA. Code Ann. § 59.1-198.

346.     Each Plaintiff is a "person" as defined by VA. Code Ann. § 59.1-198.

347.     The sale of Lely Astronaut A4 robots by Lely to Plaintiffs is a "consumer transaction" as defined by VA. Code Ann. § 59.1-198.

348.     In connection with the sale of Lely Astronaut A4 robots to Plaintiffs, Lely engaged in prohibited practices in violation of VA. Code Ann. § 59.1-200 by, among engaging in other

prohibited practices detailed herein, misrepresenting that the Lely Astronaut A4 has certain quantities, characteristics, uses and benefits, including, but not limited to, those set forth in detail herein, and is of a particular standard, quality, grade, style and model, as detailed herein.

349.    Plaintiffs purchased the Lely Astronaut A4 for the "lifestyle benefits" promised by Lely, so that they would not have to continue spending "hours in the barn, day in, day out," as is required when milking cows in a milking parlor, and, instead, could spend more time with their families and friends, while also spending more time on other household matters.  That is, Plaintiffs purchased the Lely Astronaut A4 for family, personal and household purposes.

350.    As a direct and proximate result of the foregoing, Plaintiffs have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

351.    Plaintiffs seek all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under the Virginia Consumer Protection Act, and punitive damages.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Lely, as follows:

1.   That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives, and appoint Plaintiffs' counsel as Class Counsel;

2.   That the Court award Plaintiffs and Class members compensatory, consequential, general, nominal, and punitive damages in an amount to be determined at trial;

3.  That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

4.  That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

5.  That the Court award pre- and post-judgment interest at the maximum legal rate;

6.  That the Court grant all such other relief as it deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Respectfully Submitted,

*/s/ William R. Sieben*
William R. Sieben (MN Bar No. 0100808)
Matthew J. Barber (MN Bar No. 0397240)
**SCHWEBEL GOETZ & SIEBEN**
5120 IDS Center
80 S. 8th Street, #5120
Minneapolis, MN 55402-2246
Tel.: (612) 344-0305
bsieben@schwebel.com

Patrick J. Stueve (*Pro Hac Vice* Forthcoming)
Bradley T. Wilders (*Pro Hac Vice* Forthcoming)
Jillian R. Dent (*Pro Hac Vice* Forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd Suite 200
Kansas City, Missouri 64113
Tel.: (816) 714-7100
stueve@stuevesiegel.com
wilders@stuevesiegel.com
dent@stuevesiegel.com

Arend R. Tensen (*Pro Hac Vice* Forthcoming)
**CULLENBERG & TENSEN, PLLC**
199 Heater Road, Suite 2
Lebanon, NH 03766
Tel.: (603) 448-7100
tensen@nhvt-injurylaw.com

Daniel C. Perrone (*Pro Hac Vice* Forthcoming)
**PERRONE LAW PLLC**
2136 Victory Boulevard
Staten Island, New York 10314
Tel.: (646) 470-9244
dcp@theperronefirm.com